## *In re* SANDERS.

*(Circuit Court, E. D. North Carolina.    November 14, 1892.)*

1. CONSTITUTIONAL LAW — INTERSTATE COMMERCE — STATE REGULATION — ORIGINAL
    PACKAGES.
        Acts N. C. 1891, c. 331, providing that persons selling seed in packages unmarked
    by the date when such seed were grown, except farmers selling seed in open
    bulk to other farmers or gardeners, shall be guilty of a misdemeanor, is uncon-
    stitutional and void under the interstate commerce clause of the constitution
    (article 1, § 8, cl. 3) with respect to the selling of seed in the original packages
    imported from another state.

2. SAME — POLICE POWER.
        Where a certain subject-matter is exclusively delegated to congress by the con-
    stitution, any state legislation thereon is void, even if passed in the exercise of
    the police power.

    Application of Simon F. Sanders for a writ of *habeas corpus*.    Granted,
and prisoner discharged.

*Alfred Russell* and *D. L. Russell*, for petitioner.
*John D. Bellamy, Jr.*, for the State.

GOFF, Circuit Judge.    Simon W. Sanders presents his application for
the writ of *habeas corpus*.    In substance, it alleges that petitioner is re-
strained of his liberty by the sheriff of New Hanover county, North Caro-
lina, who detains petitioner by reason of a certain *mittimus* or warrant issued

by a justice of the peace in and for said county and state, founded upon a judgment of conviction rendered by the justice for the violation of a certain statute of the state of North Carolina, passed by the general assembly of that state on the 5th day of March, 1891, entitled "An act to protect seed buyers in North Carolina," being chapter 331 of the Acts of the General Assembly of North Carolina for the year 1891, in this: that petitioner, as the agent of D. M. Ferry & Co., a firm composed of citizens of the state of Michigan, and doing business in that state, exposed to sale and sold at Wilmington, in North Carolina, certain seeds, which were shipped to petitioner from the state of Michigan by said firm of D. M. Ferry & Co., to be sold by him as their agent. It also alleges that the seeds so sold by petitioner were in the original packages as received from the state of Michigan, and it admits that the packages were not marked as required by the statute alluded to. Petitioner claims that the act of the general assembly of North Carolina, by virtue of which he was convicted, in so far as it applies to the act done by him, is in violation of the constitution of the United States, and that, therefore, no lawful conviction is possible under it, and that consequently he is restrained of his liberty wrongfully. The writ, as prayed for, was issued on the 8th day of March, 1892. The sheriff made return to the writ on the 24th day of March, 1892, admitting that he had petitioner in his custody, and that he held him in accordance with the terms of a warrant of commitment from a justice of the peace for the state and county mentioned. With his return the sheriff files a certified transcript of the record of the court of the justice, showing the trial, conviction, and commitment of the petitioner, from which it appears that the facts relative to the sale of the seed are correctly set forth in the petition filed in this matter. The sheriff, at the time he filed his return to the writ, produced before the court the petitioner, who was represented by counsel, and, there being no appearance for the sheriff nor for the state of North Carolina by counsel, the court ordered that the hearing of the matter involved in this proceeding be postponed until the next term of the circuit court of the United States at Wilmington, N. C., and committed the petitioner to the custody of the marshal of that district. At the spring term, 1892, of the circuit court at Wilmington the matters arising on the writ and return were argued by counsel for petitioner, for the sheriff, and the state of North Carolina, and submitted to the court.

The petitioner, as a member of the firm of S. W. Sanders & Co., of Wilmington, N. C., contracted with D. M. Ferry & Co., of Detroit, Mich., to sell for them garden, flower, and field seeds on certain terms and conditions set forth in a contract dated October 30, 1891. The seeds ordered were duly shipped by D. M. Ferry & Co. from Detroit, received by S. W. Sanders & Co. at Wilmington, and portions of them sold by petitioner. On the 5th day of March, 1891, the general assembly of North Carolina passed an act of which the following is a copy:

### "*An Act to Protect Seed Buyers in North Carolina.*

"The general assembly of North Carolina do enact: Section 1. That any person or persons doing business in the state, who shall sell seed, or offer for sale any vegetable or garden seed, that are not plainly marked upon each package or bag containing such seed the year in which said seed were grown, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than ten dollars or more than fifty dollars, or imprisoned not more than thirty days, for each and every offense: provided, that the provisions of the act shall not apply to farmers selling seed in open bulk to other farmers or gardeners. Sec. 2. That any person or persons who shall, with intention to deceive, wrongfully mark or label, as to date, any package or bag containing garden or vegetable seed, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than ten or more than fifty dollars, or imprisoned not less than ten or more than thirty days. Sec. 3. That this act shall be in force from and after the 1st day of September, 1891. Ratified this, the 5th day of March, 1891."

The seeds so sent by D. M. Ferry & Co. were in packages which were not marked with the year when the seeds were grown, as was required by this statute, and the sales made by the petitioner were in the original packages received from Michigan. Petitioner claims that this statute is a regulation of commerce among the states, the power to make which is not possessed by the legislature of a state, but is, by article 1, § 8, cl. 3, of the constitution of the United States, vested exclusively in the congress provided for by that instrument. Counsel for the state of North Carolina contends that the act mentioned, while it may affect commerce, is not a regulation thereof, but is simply the exercise by the state of its police power to protect its citizens from fraud. The clause of the constitution above cited reads as follows: "The congress shall have power to regulate commerce with foreign nations and among the several states and with the Indian tribes." The need of a national regulation of commerce among the states was one of the most influential causes leading to the formation of the constitution of the United States, the desire being to secure uniformity of the commercial regulations against discriminating or burdensome state legislation. It is now well established that congress has the exclusive right to regulate commerce, and that the grant to congress in the constitution relating to that subject carried with it the whole matter, leaving nothing for the state to act upon in cases where the subject is national in character. *Gibbons* v. *Ogden,* 9 Wheat. 1; *Cook* v. *Pennsylvania,* 97 U. S. 566; *Railroad Co.* v. *Fuller,* 17 Wall. 560; *Henderson* v. *Mayor, etc.,* 92 U. S. 259; *Railroad Co.* v. *Husen,* 95 U. S. 465; *Leisy* v. *Hardin,* 135 U. S. 108, 10 Sup. Ct. Rep. 681. Is this act of the general assembly of North Carolina, as applied to the sale in question, a regulation of interstate commerce? If so, it is void. The fact that congress has not legislated on this particular subject—has not especially regulated this character of commerce—does not authorize the state legislature to regulate it, but shows that congress intends such sales to be free in all the states, and not to be restricted or burdened by any state statute. *Philadelphia & S. M. S. S. Co.* v. *Pennsylvania,* 122 U. S. 336, 7 Sup.

Ct. Rep. 1118; *Bowman* v. *Railway Co.*, 125 U. S. 465, 8 Sup. Ct. Rep. 689, 1062. In *Robbins* v. *Taxing Dist.*, 120 U. S. 489, 7 Sup. Ct. Rep. 592, the court says:

"The power granted to congress to regulate commerce among the states being exclusive when the subjects are national in their character, or admit only of one uniform system of regulation, the failure of congress to exercise that power in any case is an expression of its will that the subject shall be left free from restrictions or impositions upon it by the several states."

The meaning of the decisions of the supreme court on this question is expressed by William Draper Lewis in his recent instructive work entitled "The Federal Power over Commerce, and Its Effect on State Action," (page 123:)

"Whenever the subject effected by state laws is in its nature national, or requires one uniform rule or plan of regulation, then the inaction of congress is evidence to the court of its intention that the commerce in this respect shall be free and untrammeled; but when the subject, from its local nature, does not seem to require a uniform rule of regulation, the inaction of congress is evidence to the court that that body is willing that the states can effect such subjects in the legitimate exercise of their reserved powers."

In one of the early cases in which this clause of the constitution received careful consideration, (*Brown* v. *Maryland*, 12 Wheat. 447,) Chief Justice MARSHALL, in delivering the opinion of the court, used this language:

"What, then, is the just extent of a power to regulate commerce with foreign nations and among the several states? This question was considered in the case of *Gibbons* v. *Ogden*, 9 Wheat. 1, in which it was declared to be complete in itself, and to acknowledge no limitations other than are prescribed by the constitution. The power is coextensive with the subject on which it acts, and cannot be stopped at the external boundary of a state, but must enter its interior. * * * If this power reaches the interior of a state, and may be there exercised, it must be capable of authorizing the sale of those articles which it introduces. Commerce is intercourse. One of its most ordinary ingredients is traffic. It is inconceivable that the power to authorize this traffic, when given in the most comprehensive terms, with the intent that its efficacy should be complete, should cease at the point when its continuance is indispensable to its value. To what purpose should the power to allow importation be given, unaccompanied with the power to authorize a sale of the thing imported? Sale is the object of importation, and is an essential ingredient of that intercourse of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right, not only to authorize importation, but to authorize the importer to sell."

If congress should pass an act requiring all seed sold in packages to be marked with the year in which the same were grown, and prohibiting the sale unless so marked, regardless of the country where grown, including imported and domestic seeds, as this act does, it would be the exercise by congress of the power granted by the constitution, and a regulation of commerce among the states. The difficulty of honestly complying with such legislation would be presented to the consideration of that body as a reason why the statute should be amended or repealed,

If this be true, (and can it be doubted that congress has the constitutional right to legislate on this subject?) and if the conclusion I reach is correct, that congress has exclusive jurisdiction of such regulation, does it not follow that this legislation by the general assembly of North Carolina is unconstitutional and void? If the states can legislate, as to the matter of the North Carolina statute, because of the absence of legislation by congress on the subject, as was claimed by counsel in the argument, would not the provisions of that act be held to be so unreasonable, such a burden on the business of the country, and so interfere with the rights and privileges of the citizens thereof, as to render it void? It virtually prohibits the sale in North Carolina of seed imported from foreign countries, for the packages would not be marked, and our dealers could not truthfully mark them as required by that statute. It prevents the sale in North Carolina of seed lawfully carried into that state in the mails of the United States, sent by dealers residing and doing business in other states, who pay to the government of the United States the postage or freight for the transportation of the same, under laws passed by congress. It favors the grower and dealer in seeds doing business in North Carolina to the detriment of the growers and dealers of all the other states, for the farmers of North Carolina are, in effect, regarded as growers and dealers in seeds, and exempted from the requirements of the law, and it would follow that all persons desiring to purchase from them would be "farmers or gardeners." It would thereby permit a certain portion of the citizens of that state to engage in that business, and prohibit all the rest from so doing. Why should the farmers of North Carolina be permitted to sell seed in open bulk to other farmers or gardeners, and the petitioner, or D. M. Ferry & Co., or any citizen who desires to engage in that traffic, be prohibited from so doing? How does this protect seed buyers? What is meant by "open bulk?" The natural meaning of the words is, "in the mass; exposed to view; not tied or sealed up." Used in the connection they are in this act, they do not relate to the quantity that may be sold, nor does the statute restrict it to an ounce or less, or require a bushel or more to be sold. Any quantity of any garden or vegetable seed, not in a package or bag, but in open bulk, may be sold by a farmer to other farmers or gardeners, without the mark relating to the year when grown. The effect of this is that all dealers must sell their seeds through farmers, or be excluded from the market. The farmer may sell seeds, free from any restrictions or marks, but any one else selling the same kind of seeds, even if from the same original mass or bulk, if the same be in packages or bags, must have plainly marked upon them the year when grown,—the words that give purity to the contents, and eliminate all fraud from the sale. This statute virtually prevents the importation into the state of North Carolina of all garden and vegetable seeds in paper packages or bags, for sale in the packages in which imported, and destroys that extensive and useful trade, so far as that state is concerned. If one state can do this, all can. If North Carolina can impose this burden, other states can and will impose similar or heavier ones, to the great damage

of a commerce in which not only this petitioner and D. M. Ferry & Co. are interested, but in which many citizens of many of the states have invested their means, and to which they have devoted their time and energies. In *Ex parte Kieffer*, 40 Fed. Rep. 399, Mr. Justice Brewer says:

"The moment you find any act of the legislature or any ordinance of a city which prevents the free exchange of lawful articles of commerce between the states, you find an act or ordinance which contravenes the commercial clause of the United States constitution."

It was argued that the statute in question is but the legitimate exercise of the police power of the state. What is the "police power," conceded to and proper to be exercised by the state? About this eminent jurists have differed, and have found it difficult to draw the line between it and the powers granted to the general government. Mr. Justice Strong, in delivering the opinion of the court in *Railroad Co.* v. *Husen*, 95 U. S. 465, said, on this subject:

"It is generally said to extend to making regulations promotive of domestic order, morals, health, and safety. As was said in *Thorpe* v. *Railroad Co.*, 27 Vt. 149: 'It extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property, within the state, according to *sic utere tuo ut alienum non lædas*, which being of universal application, it must of course be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others.' It was further said that by the general police power of a state persons and property are subjected to all kinds of restraint and burdens in order to secure the general comfort, health, and prosperity of the state, of the perfect right of the legislature to do which no question ever was, or, upon acknowledged general principles, ever can be, made, so far as national persons are concerned."

It may also be admitted that the police power of a state justifies the adoption of precautionary measures against social evils. Under it a state may legislate to prevent the spread of crime, or pauperism, or disturbance of the peace. It may exclude from its limits convicts, paupers, idiots, and lunatics, and persons likely to become a public charge, as well as persons afflicted with contagious or infectious diseases; a right founded, as intimated in the *Passenger Cases*, 7 How. 283, by Mr. Justice Grier, in the sacred law of self-defense. The same principle, it may also be conceded, would justify the exclusion of property dangerous to the property of citizens of the state; for example, animals having contagious and infectious diseases. All these exertions of power are in immediate connection with the protection of persons and property against noxious acts of other persons, or such a use of property as is injurious to the property of others. They are self-defensive. I do not deem it necessary to review the cases on this subject. It was really disposed of in *Gibbons* v. *Ogden*, the reasoning of Chief Justice Marshall being, to my mind, conclusive, and, as expressed in said case, never having been departed from in matters where exclusive jurisdiction is given to congress. As he well says: "The nullity of an act inconsistent with the

constitution is produced by the declaration that the constitution is supreme." Mr. Justice MILLER, in *Henderson* v. *Mayor*, 92 U. S. 259, on this question says:

"It is clear, from the nature of our complex form of government, that whenever the statute of a state invades the domain of legislation which belongs exclusively to the congress of the United States, it is void, no matter under what class of powers it may fall, or how closely allied to powers conceded to belong to the states."

I conclude that the police power of a state cannot be held to embrace a subject confided exclusively to congress by the constitution of the United States. If the subject-matter of state legislation is included in the exclusive grant of commercial power to congress, then the state enactment is void, even if it passed in the exercise of the police power of the state. The authorities in support of this are numerous, and from them I cite *Railroad Co.* v. *Husen*, 95 U. S. 465; *Crutcher* v. *Kentucky*, 141 U. S. 47, 11 Sup. Ct. Rep. 851; *Leisy* v. *Hardin*, 135 U. S. 108, 10 Sup. Ct. Rep. 681.

Other questions are submitted by counsel for petitioner, but, holding as I do on the matters I have mentioned, I do not find it necessary to pass upon them.

For the reasons that I have given I conclude that the act of the general assembly of the state of North Carolina entitled "An act to protect seed buyers in North Carolina," being chapter 331 of the Acts for the year 1891, is inoperative and void, and that the petitioner is in custody in violation of the constitution of the United States. I therefore order that he be discharged from custody.