IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## MIDDLE DIVISION.

---

## NASHVILLE, DECEMBER TERM, 1916.

---

STATE *v.* DUNCAN MCKAY *et al.**

(*Nashville.* December Term, 1916.)

1. **CONSTITUTIONAL LAW.** Pure seed law. Equal protection of law.

The Pure Seed Law (Acts 1909, chapter 395) is not unconstituional class legislation violating the equal protection clause of the Fourteenth Amendment because of exemption from its operation, by subsection 5 of section 8 thereof of the farmer grower, in selling seeds, since such exemption is closely limited to seeds grown by the seller and sold and delivered by him on his own premises to a purchaser for seeding by the purchaser himself, and the differentiation of such sale from open market sales cannot be considered arbitrary, in view of the greater opportunity for deception in selling in open market. (*Post, pp.* 282-289.)

Acts cited and construed: Acts 1909, ch. 395; Acts 1893, sec. 9.

Cases cited and approved: Connolly v. Union Sewer Pipe Co., 184 U. S., 540; Motlow v. State, 125 Tenn., 547; City of Memphis v. State ex rel., 133 Tenn., 83; International Harvester Co. v. Missouri, 234 U. S., 199; Mobile Co. v. Kimball, 102 U. S., 691;

---

*On the effect of commerce clause on validity of state police regulations as to branding or labeling articles of commerce, see notes in 40 L. R. A. (N. S.), 880; 47 L. R. A. (N. S.), 985.

State v. McKay.

Consolidated Coal Co. v. Illinois, 185 U. S., 203; McLean v. Arkansas, 211 U. S., 539; Armour v. North Dakota, 240 U. S., 510; Eubank v. Richmond, 226° U. S., 137; Lemieux v. Young, 211 U. S., 489; Ozan Lumber Co. v. Union County Nat. Bank, 207 U. S., 255; Atlantic C. L. R. Co. v. George, 234 U. S., 280.

Cases cited and distinguished: Gibbons v. Ogden, 9 Wheat., 1200; Heath & Milligan Mfg. Co. v. Worst, 207 U. S., 338; Rast v. Van Deman & Lewis Co., 240 U. S., 342; St. Louis, etc., R Co. v. Arkansas, 240 U. S., 518; St. John v. New York, 201 U. S., 633.

## 2. COMMERCE. Pure seed law. Validity.

The Pure Seed Law is not invalid as an unwarrantable burden on interstate commerce in violation of United States Const., its burden on such commerce by reason of the exemption in section 8, subsec. 5, of the farmer grower being, inconsiderable, remote, incidental, and not designed. (*Post, pp.* 289-294.)

Cases cited and approved: .Brimmer v. Rebman, 138 U. S., 78; Plumley v. Massachusetts, 155 U. S., 461.

Case cited and distinguished: Minnesota v. Barber, 136 U. S., 319.

## 3. COMMERCE. Local regulations. Inspection. Interference with interstate commerce.

Commerce between States may be affected by local inspection or police· regulations without the latter becoming invalid on that account; for when the local police regulation has real relation to the suitable protection of the people of the State and is reasonable in its requirements, it is not invalid because it may incidentally affect interstate commerce. (*Post, pp.* 294-301.)

Cases cited and approved: Savage v. Jones, 225 U. S., 525; Reid v. Colorado, 187 U. S., 137; Pittsburg & S. Coal Co. v. State of Louisiana, 156 U. S., 599; Hall v. Geiger-Jones., 242 U. S., 539

Cases cited and distinguished: Sherlock v. Alling, 93 U. S., 99; ·Sligh v. Kirkwood, 237 U. S., 52; New Mexico ex rel. v. Denver · etc., R. Co., 203 U. S., 38; In re Sanders (C. C.), 52 Fed., 802.

**4. CONSTITUTIONAL LAW. Judicial functions. Reasonableness of laws.**

The consideration and determination of the reasonableness of regulations under the police power rests with the legislative departments, and courts will not examine the question *de novo* and overrule such judgment by substituting its own, unless it clearly appears that those regulations are so beyond all reasonable relation to the subject to which they are applied as to amount to mere arbitrary usurpation of power, or are unmistakeably in excess of the legislative power or arbitrary beyond possible justice, bringing the case within the rare class in which such legislation is declared void. (*Post, pp.* 301, 302.)

Case cited and approved: Hutchinson Ice Cream Co. v. Iowa, 242 U. S., 153.

Case cited and distinguished: Schmidinger v. Chicago, 226 U. S., 578.

**5. EVIDENCE. Judicial notice.**

The courts cannot judicially know that no means or process exist for cleaning seeds so as to exclude weed seeds from being present therein in quantities not more than 1 in 10,000. (*Post, pp.* 302-306.)

Cases cited and approved: Ex Parte Foley, 172 Cal., 744; People v. Hawkins, 157 N. Y., 1.

Case cited and distinguished: Ex Parte Hayden, 147 Cal., 649.

**.6. CONSTITUTIONAL LAW. Due process of law.**

The Pure Seed Law is not a violation of the due process of law clause of Const., U. S. Amend. 14, because section 11 of the law contains a proviso that no one shall be convicted under the act if he is able to show that weed seeds named in section 3 are present in quantities not more than 1 in 10,000, and that due diligence has been used to find and remove them; such provision not showing palpable capriciousness or mere arbitrary usurpation of power. (*Post, pp.* 302-306.)

**7. AGRICULTURE. Pure seed law. Validity.**

The Pure Seed Law, is not invalid as arbitrary and unjust, because section 1 thereof requires labels on packages of agricul-

State v. McKay.

tural seeds to set forth the locality where the seed was grown. (*Post*, *pp.* 302-306.)

**8. EVIDENCE. Judicial notice.**

The courts do not judicially know that in the ordinary conduct of business the requirement of a statute that agricultural seeds be labeled with the locality where the seed is grown is an impracticable one. (*Post*, *pp.* 306, 307.)

Case cited and approved: Schraubstadter v. U. S., 199 Fed., 568.

## FROM DAVIDSON.

Appeal from the Criminal Court of Davidson County.—A. B. NEIL, Judge.

W. B. LAMB and Attorney-General FRANK M. THOMPSON, for the State.

CHAS. C. TRABUE, ED. J. SMITH and FRANK LANGFORD, for appellee.

MR. JUSTICE WILLIAMS delivered the opinion of the court.

The defendants in error were indicted for a violation of Act 1909, chapter 395, known as the Pure Seed Law. A motion to quash on the ground that the act is unconstitutional was sustained by the court, and the State has appealed and assigned errors.

An outline of the act follows, the portions against which the attacks are directed being quoted in full; other sections not being set forth in such detail:

"Section 1. That every parcel, package, or lot of agricultural seeds as hereafter defined in this act, and containing one pound or more, offered or exposed for sale in the State of Tennessee, for use within this State, shall have affixed thereto, in a conspicuous place on the outside thereof, distinctly printed or plainly written in the English language, a statement certifying:

"First: The name of seed.

"Second: Full name and address of the seedman, importer, dealer, or agent.

"Third: A statement of the purity of the seed contained, specifying the kind and percentage of the impurities as defined in this act; provided, that said seeds are below the standard fixed in this act.

"Fourth: Locality where said seed was grown, and when grown."

Section 2 declares what are agricultural seeds within the intent of the act.

Section 3 prescribed that such seeds shall not be sold within this State unless they are free from a number of weed seeds, named.

Section 4 declares what kind of seed shall constitute impurities, and provides that, when they are present in quantity exceeding two per cent. of weight, "the approximate percentage of each shall be plainly indicated" on the label.

Section 5 declares that sand, dirt, chaff, and foreign substances in seeds shall constitute impurities, and that their presence shall be shown on the label.

Section 6 prescribes what shall constitute mixed or adulterated seeds.

Section 7 defines what shall constitute misbranding.

Section 8 of the act provides, among other things, as follows:

"The provisions concerning agricultural seeds contained in this act shall not apply to:  .  .  .

"Fifth: The sale of seed that is grown, sold, and delivered by any farmer on his own premises for seeding by the purchaser himself, unless the purchaser of said seed obtains from the seller at the time of the sale thereof a certificate that the said seed is supplied to the purchaser, subject to the provisions of this act."

Section 9 fixes the standard of purity and viability of agricultural seeds.

Section 10 declares that the Commissioner of Agriculture shall enforce the provisions of the act.

Section 11 provides that any one who shall violate any of the provisions of this act shall be guilty of a misdemeanor, and, upon conviction, shall be fined not more than $100 and costs of prosecution.

Section 12 provides that every importer, dealer or agent shall pay an inspection fee of two cents per bushel on cereals, and five cents per bushel on grasses and clovers, etc.

Section 13 declares that the moneys derived from fees and fines under the act shall be used for the purpose of enforcing its provisions.

This act is an attempted exercise by the State of the police power, which was one of the powers re-

served to the States in the national Constitution. The police power is thus exercised in aid of an inspection law, if indeed inspection laws may not be deemed to be one manifestation of the police power itself, "the most essential of powers, at times the most insistent, and always one of the least limitable of the powers of government." In the celebrated case of *Gibbons* v. *Ogden,* 9 Wheat., 1200, 6 L. Ed., 23, 71, Chief Justice MARSHALL said:'

"But the inspection laws are said to be regulations of commerce, and are certainly recognized in the Constitution as being passed in the exercise of a power remaining with the States. That inspection laws may have a remote and considerable influence on commerce will not be denied; but that a power to regulate commerce is the source from which the right to pass them is derived cannot be admitted. .. . . . They form a portion of that immense mass of legislation, which embraces everything within the territory of a State, not surrendered to the general government; all. which can be most advantageously exercised by the States themselves."

The Constitution of the United States declares: "No State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws."

The clause, "except what may be absolutely necessary for executing its inspection laws," affirmatively recognizes the power to pass inspection laws as an existing sovereign right in the States.

I. An attack is made on the act as being unconstitutional arbitrary class legislation, the argument being that subsection 5 of section 8 exempts the farmer grower from the operative force of all provisions of the act, without there being any substantial reason to support the classification. The objection is rested principally on the authority of *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S., 540, 22 Sup. Ct.. 431, 46 L. Ed., 679. In that case the constitutionality of the trust statute of the State of Illinois was considered, with result that it was denounced as unconstitutional, because in violation of the equal protection clause of the Fourteenth Amendment. The statute in substance, as construed, provided that all except producers of agricultural commodities and raisers of live stock, who combined their capital for any of the purposes named in the act, should be punished. Section 9 of that act (Laws 1893, p. 182) set forth:

"The provisions of this act shall not apply to agricultural products or live stock while in the hands of the producer or raiser."

The court said: "The statute so provides notwithstanding persons engaged in trade or in the sale of merchandise and commodities, within the limits of a State, and agriculturalists and raisers of live stock, are all in the same general class, that is they are all alike engaged in domestic trade, which is, of right, open to all, subject to such regulations, applicable alike to all in like conditions, as the State may legally prescribe. . . .

"It cannot divide those engaged in trade into classes and make criminals of one class if they do certain forbidden things, while allowing another and favored class engaged in the same domestic trade to do the same things with impunity. . . . Such a statute is not legitimate exertion of the power of classification, rests upon no reasonable basis, is purely arbitrary, and plainly denies the equal protection of the laws to those against whom it discriminates."

The ruling of the court was that agricultural products and live stock cannot be segregated from other commodities in respect of regulations against restraint of trade therein. Agriculturists in trade combination may not be treated as distinct from others trading in like commodities.

A determination of the contention that the principle of the Connolly Case establishes the invalidity of the act under review calls for a construction of subsection 5 of section 8. In order to the nonapplicability to a selling farmer of the provisions of the statute, these several features must appear in conjunction: (a) The seed must be grown by him; (b) sold by him on his own premises; (c) with delivery there; and (d) to a purchaser for seeding by the purchaser himself. Except in respect of a sale thus closely restricted, the farmer producer is subject to the penalties of the act.

So construed, we have not certain dealers set off from other dealers handling the same commodity, as

State v. McKay.

in the Connolly Case. We have transactions in open market put in a class distinct from a restricted kind of non-market sales; sales to whomsoever as distinct from sales on the farm by one farmer to another, when the use to be made of the transferred seed by the latter is also restricted. May not open market sales be regulated without at the same time and in like manner regulating such confined sales? Must the machinery necessary for the protection of the public in respect of the former be applied to the latter, notwithstanding its total unfitness thereto, and the probability of its breaking down in the effort at application? We do not believe that it in any wise partakes of the arbitrary to say that one method of regulation may be applied to the market dealer without its reaching to sales of seed by a farmer to his tenant, his cropper, or his neighbor, or another farmer, for the reason that such seeds are sold where grown, and under conditions that give the purchaser a fair opportunity to learn, at the time and place of the production and what kind of crop produced the seed. The same occasion does not arise for protection through the medium of public inspection, test or safeguard. Further, the same facilities for the perpetration of fraud, in sales so directly made do not exist—the seller is in likelihood personally known to the purchaser. The remedy for a fraud, if committed in such a sale, is one to be established and enforced under dissimilar conditions.

137 Tenn.—19

We need not go into rules that this court has prescribed as tests of arbitrary classification, in view of the fact that the principles touching the range of discretion of the legislature were elaborated in *Motlow* v. *State,* 125 Tenn., 547, 145 S. W., 177, and in the very recent case of *City of Memphis* v. *State ex rel..* 133 Tenn., 83, 179 S. W., 631, L. R. A., 1916B, 1151.

A comprehensive review of the decisions of the supreme court of the United States on that subject may be found in *International Harvester Co.* v. *Missouri*, 234 U. S., 199, 34 Sup. Ct., 859, 58 L. Ed., 1276, 52 L. R. A. (N. S.), 525.

We shall refer to some of the decisions of that tribunal which touch the validity of the segregation of a class of dealers or one business from others for regulation under the police power. The principles enunciated in each may find application in the pending case.

*Heath & Milligan Mfg. Co.* v. *Worst,* 207 U. S., 338, 28 Sup. Ct., 114, 52 L. Ed., 236 involved the constitutionality of a State act "to prevent the adulteration of and deception in the sale of white lead and mixed paints." A discrimination was asserted to have been made in favor of paste paints and certain other kinds of mixed paints. The court said:

"Classification may not be merely arbitrary, but necessarily there must be great freedom of discretion, even though it result in 'ill-advised, unequal and oppressive legislation.' *Mobile County* v. *Kimball,*

State v. McKay.

102 U. S., 691, 26 L. Ed., 238. And this necessarily on account of the complex problems which are presented to government. Evils must be met as they arise and according to the manner in which they arise. The right remedy may not always be apparent. Any interference, indeed, may be asserted to be evil, may result in evil. At any rate, exact wisdom, and nice adaptation of remedies are not required by the Fourteenth Amendment, nor the crudeness nor the impolicy nor even the injustice of State laws redressed by it. . . .

"There is a distinction between the paints and the evils to which the statute was addressed may not exist or be flagrant in one as in the other. There, indeed, may be a degree of competition between them, but other circumstances and conditions may have directed the legislative discretion. This record certainly does not present any data to make it certain that the discretion was arbitrarily exercised. Legislation which regulates business may well make distinctions depend upon the degrees of evil without being arbitrary or unreasonable."

Inspection laws for mines are upheld though limited to mines where more than five men are employed. *Consolidated Coal Co.* v. *Illinois,* 185 U. S., 203, 22 Sup. Ct. 616, 46 L. Ed., 872, followed by *McLean* v. *Arkansas*, 211 U. S., 539, 551, 29 Sup. Ct., 206, 53 L. Ed., 315, 321, the rulings being placed on the ground that mines which are worked on so small a scale as to require only five operatives would not

be likely to need the careful inspection provided for larger mines.

The singling out for regulations of the sale of lard in cans or packages from other foods is sustained on the ground that the "power may be determined by degrees of evil, or exercised in cases where detriment is specially experienced." *Armour* v. *North Dakota*. 240 U. S.. 510, 36 Sup. Ct., 440, 60 L. Ed., 771, Ann. Cas., 1916D, 548, affirming 27 N. D.. 177, 145 N. W., 1033, L. R. A., 1916E, 380, Ann. Cas.. 1916B, 1149.

In *Rast* v. *Van Deman & Lewis Co.*, 240 U. S., 342, 357, 36 Sup. Ct., 370, 374, 60 L. Ed. 679, the classification of sellers of goods accompanied by coupons from sellers without such inducements to purchasers, for the imposition of an additional tax, was sustained  It was said:

"The difference between a business where coupons are used, even regarding their use as a means of advertising, and a business where they are not used, is pronounced. . . . It makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate in such contrariety. . . .

"It is the duty and function of the legislature to discern and correct evils, and by evils we do not mean some definite injury, but obstacles to a greater public welfare. *Eubank* v. *Richmond*, 226 U. S., 137.

142, 33 Sup. Ct., 76, 57 L. Ed., 156, 42 L. R. A. (N. S.), 1123, Ann. Cas., 1914B, 192.''

In perhaps the latest reported case on the point (*St. Louis. etc.. R. Co.* v. *Arkansas.* 240 U. S.. 518, 36 Sup. Ct., 443, 60 L. Ed., 776) it was said:

''We have recognized the impossibility of legislation being all-comprehensive, and that there may be practical groupings of objects which will, as a whole, fairly present a class of itself, although there may be exceptions in which the evil aimed at is deemed not so· flagrant.'' ·

See, also, *Lemieux* v. *Young,* 211 U. S., 489, 29 Sup. Ct., 174, 53 L. Ed., 295; *Ozan Lumber Co.* v. *Union County Nat. Bank,* 207 U. S., 255, 28 Sup. Ct., 89, 52 L. Ed., 195; *Atlantic C. L. R. Co.* v. *Georgia,* 234, U. S., 280, 34 Sup. Ct., 829, 58 L. Ed., 1312.

A case specially pertinent, since it involved a claimed arbitrary discrimination as between non-producing and producing venders in an inspection law, is *St. John* v. *New York,* 201 U. S., 633, 26 Sup. Ct., 554, 50 L. Ed., 896, 5 Ann. Cas., 909. Sustaining the classification, it was said:

''It is contended that the power is not exercised on all alike who stand in the same relation to the purpose, and quite dramatic illustrations are used to show discrimination. A picture is exhibited of producing and nonproducing venders selling milk side by side; the latter, it may be, a purchaser from the former; the act of one permitted, the act of the other prohibited or penalized. If we could look no farther

than the mere act of selling, the injustice of the law might be demonstrated, but something more must be considered. Not only the final purpose of the law must be considered, but the means of its administration—the ways it may be defeated. Legislation, to be practical and efficient, must regard this special purpose as well as the ultimate purpose. The ultimate purpose is that wholesome milk shall reach the consumer, and it is the conception of the law that milk below a certain strength is not wholesome, but a difference is made between milk naturally deficient and milk made so by dilution. It is not for us to say that this is not a proper difference, and regarding it the law fixes its standard by milk in the condition that it comes from the herd. It is certain that if milk starts pure from the producer it will reach the consumer pure if not tampered with on the way. To prevent such tampering the law is framed and its penalties adjusted.''

In the case at bar, we repeat that the act does not exempt so broad a class as producing venders of seed. And certainly a farmer in making such limited sales is not under the same temptation to adulterate his output, not to mention the evident inequality in skill and facilities to that end.

We, therefore, hold that the asserted unreasonable and capricious classification does not appear.

II. Another attack on the act as unreasonably discriminatory is from a different angle—the dis-

crimination asserted to exist being one in favor of
seeds produced in this State.  It is insisted that by
reason of the exemption contained in section 8,
subsec. 5, the act is not a valid inspection law or
the valid exercise of the police power of the State;
but that, under the guise of an inspection law, it is an
unwarrantable burden on interstate commerce, the
inevitable tendency of which is towards the creation
of a preference or advantage, in dealing in agri-
cultural seeds, to producers of such seeds in Tennes-
see.  The predicate of the supporting argument is
that the practical result is that all seeds grown out-
side of Tennessee are subject to the restrictive pro-
visions of the act, while all seeds grown in Tennessee
and sold by the producer are free from such re-
strictions.

On construction of the statute, we find no evidence
of a purpose to discriminate in favor of seeds
produced in this State.  The thing sought to be re-
gulated is the sales of seeds which are made in this
State.  The sales of seeds that are the product of this
State are, equally with those produced in other
States, within the provisions of the statute, except
in the closely confined instance outlined in what was
said above respecting classification.  That narrow
exemption was not designed to discriminate in favor
of the Tennessee production of seeds.  It has relation
rather to the place and circumstances of sales.  The
legislature evidently thought that farmers' sales of
seeds of their own production on the farm in their

nature were accompanied by certain safeguards to the purchasing public, and that but a slight additional statutory restriction was necessary in respect thereto, and, further, that an effort to apply the machinery of the act, necessarily somewhat intricate, to sales by a farmer to his tenant, for example, would make the entire scheme impracticable, unworkable, and impotent.

We have therefore to consider whether, when the exemption has been brought to what seems to be the irreducible minimum, the act must fall as discriminatory, and the benefits of a system created for the public welfare lost.

It cannot be successfully contended that any interference with traffic in seeds coming from without the limits of the State was intended. Such was not the main purpose, or one of the prime purposes, of the legislation; and. if such interference to any degree is worked, it is not done directly but by way of incident.

It is not insisted that the Congress has occupied the field by regulating the interstate shipments or sales of seeds, or that it was not within the power of the legislature to act in the premises. One of the deepest thinkers in this country on problems of legislation, Elihu Root, has called attention by way of warning to the States to the loss by the States to the national government of powers capable of being exercised by them, and he has pointed out that this has been due in the past to supineness on the part of the States and their nonexercise of sovereign powers, leading

State v. McKay.

almost inevitably to the assumption and exercise of power on the part of the general government in fields into which public interest and sentiment demand that protection shall come from some source.

But where a State, as here, has moved to protect its inhabitants in respect of some vital concern, can it yet be validly urged that, though in the exercise of a conceded sovereign function, it may not do so except on terms of absolute noninterference with interstate commerce?

In a government like ours statal and national powers are interlaced, and they must touch and to some extent trench on one another in their efficient interplay. The ultimate tribunal that, as the guardian of both alike, has to define the limitations, under the Constitution, on the operation of these respective powers has not been unaware of the difficulties that inhere in the problem of setting bounds to the exercise of sovereign functions; and we are to look to its decisions for guidance to a proper determination of the question presented: Does the statute unwarrantably discriminate against interstate commerce?

The supreme court of the United States in such an investigation looks to substance rather than form; to the tendency or the necessary effect in the operation of an act, not so much to what it avows in terms; and thus determines whether a State statute unduly burdens interstate commerce by reason of discriminations against it.

In *Minnesota* v. *Barber,* 136 U. S., 319, 10 Sup. Ct., 863, 34 L. Ed., 457, it was said:

"There may be no purpose upon the part of a legislature to violate the provisions of that instrument, and yet a statute enacted by it, under the forms of law, may. by its necessary operation. be destructive of rights granted or secured by the Constitution.

. . .

"Although this statute is not avowedly, or in terms, directed against the bringing into Minnesota of the products of other States, its necessary effect is to burden or obstruct commerce with other states, as involved in the transportation into that State, for purposes of sale there, of all fresh beef," etc.

The cases chiefly relied upon by appellees to show undue discrimination are those of *Minnesota* v. *Barber,* supra, *Brimmer* v. *Rebman,* 138 U. S., 78, 11 Sup. Ct., 213, 34 L. Ed., 862, and cases following them.

In *Minnesota* v. *Barber,* the court was considering a statute which prohibited the sale of any fresh meat in Minnesota for human food unless the cattle should have been inspected within the State and within the narrow time limit of twenty-four hours before the slaughter of the same, and the court held that the practical effect of the act was to discriminate against the products and business of other States in favor of the products and business of Minnesota, and therefore to unduly burden commerce among the several States.

State v. McKay.

In *Brimmer* v. *Rebman* a statute of Virginia was under test which fixed a limit of distance of shipment, instead of time, in that it forbade the sale within that State of any fresh meats "which shall have been slaughtered one hundred miles or over from the place at which it is offered for sale, until and except it has been inspected." The holding was that for all practical ends, the statute prevented citizens of distant States from competing, upon terms of equality, with local dealers in Virginia, and was a "direct burden upon commerce among the States, and therefore void."

These rulings were based on the fact that a "direct burden" was imposed on interstate commerce, excluding, by necessary operation, all fresh meats "although entirely sound, taken from animals slaughtered in other States. *Plumley* v. *Massachusetts,* 155 U. S., 461, 15 Sup. Ct., 154, 39 L. Ed., 223.

The discrimination inveighed against in the pending case is one that is claimed to affect such commerce. But commerce between the States may be affected by local inspection laws or police regulations, without the latter becoming invalid on that account; for when the local police regulation has real relation to the suitable protection of the people of the State, and is reasonable in its requirements, it is not invalid because it may "incidentally affect interstate commerce." *Savage* v. *Jones,* 225 U. S., 525, 32 Sup. Ct., 722, 56 L. Ed., 1191.

A State may so protect its people and their property against threatened dangers if the means employed to that end "do not go beyond the necessities of the case." *Reid* v. *Colorado,* 187 U. S., 137, 23 Sup. Ct., 92, 47 L. Ed., 108.

As was said in the case of *Pittsburg & S. Coal Co.* v. *State of Louisiana,* 156 U. S., 599, 15 Sup. Ct., 463, 39 L. Ed., 548, quoting from case of *Sherlock* v. *Alling,* 93 U. S., 99, 23 L. Ed., 819:

"Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it within the meaning of the Constitution. . . . And it may be said, generally, that legislation of a State, not directed against commerce or any of its regulations, but relating to the rights, duties, and liabilities of citizens, and only indirectly and remotely affecting the operations of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water, or engaged in commerce, foreign or interstate, or in any other pursuit."

Again in *Sligh* v. *Kirkwood.* 237 U. S., 52, 35 Sup. Ct.. 501, 59 L. Ed., 835:

"Nor does it make any difference that such regulations incidentally affect interstate commerce, when the object of the regulation is not to that end, but is a legitimate attempt to protect the people of the State."

In *New Mexico ex rel.* v. *Denver, etc., R. Co.,* 203 U. S., 38, 27 Sup. Ct., 1, 51 L. Ed., 78, it was said

of the exercise of the police power in aid of an inspection law:

"It is true that it affects interstate commerce, but we do not think such was its primary purpose, and while it may have an effect to levy a tax upon this class of property, the main purpose evidently was to protect the people against fraud and wrong."

At the time this opinion was prepared, we did not have access to the decision of the supreme court, holding valid the "Blue Sky Law," against a like attack, but before its filing a report of that case had appeared in *Hall* v. *Geiger-Jones Co.* (October Term), 242 U. S., 539, 37 Sup. Ct., 217, 61 L. Ed.,—.

Applying these tests to the act under review, we construe it not to have the meaning assigned it by appellees. It does not impose burdens on seeds from other States because of their foreign origin. Tennessee grown seeds are covered by its provisions when in like manner sold on the market; farmer producers are within its operative force as to market sales, and any sale by such one is to be treated as a market sale unless it be consummated on his farm, and then for a restricted purpose. All in the same class are affected alike. The exemption we believe to have been made by reason of overruling necessity, and therefore the means employed "do not go beyond the necessities of the case." Had the Congress itself moved to regulate the interstate sales of seeds, it in all probability would have made the same exception in order to prevent the law from defeating

itself by reason of impracticability of enforcement. Why may not a legislature, Congress not having occupied the field?

We, therefore, hold that, if interstate commerce be affected at all, it is only by way of incident, not directly, remotely not primarily, and that the main purpose of the act was to protect against fraud and harm, not directed against commerce between the States by way of a discrimination in favor of seeds produced in this state.

A case that is claimed to be directly in point is *In re Sanders* (C. C.), 52 Fed., 802, 18 L. R. A., 549, in which the court was considering a statute of North Carolina that enacted:

"That any person or persons doing business in the State, who shall sell seed, or offer for sale any vegetable or garden seed, that are not plainly marked upon each package or bag containing such seed the year in which said seed were grown, shall be guilty of a misdemeanor, and upon conviction thereof, shall be fined not less than ten dollars or more than fifty dollars, or imprisoned not more than thirty days, for each and every offense; provided, that the provisions of the act shall not apply to farmers selling seed in open bulk to other farmers or gardeners."

It will be observed that this seed law exempted from its operation "farmers selling seed in open bulk to other farmers or gardeners;" and, in the course of its opinion, the court said:

''It favors the grower and dealer in seeds doing business in North Carolina to the detriment of the growers and dealers of all the other States, for the farmers of North Carolina are, in effect, regarded as growers and dealers in seeds, and exempted from the requirements of the law, and it would follow that all persons desiring to purchase from them would be 'farmers or gardeners.' It would thereby permit a certain portion of the citizens of that State to engage in that business, and prohibit all the rest from so doing. Why should the farmers of North Carolina be permitted to sell seed in open bulk to other farmers or gardeners, and the petitioner, or D. M. Ferry & Co., or any citizen who desires to engage in that traffic, be prohibited from so doing? How does this protect seed buyers? What is meant by 'open bulk?' The natural meaning of the words is, 'In the mass; exposed to view; not tied or sealed up.' Used in the connection they are in this act, they do not relate to the quantity that may be sold, nor does the statute restrict it to an ounce or less, or require a bushel or more to be sold. Any quantity of any garden or vegetable seed, not in a package or bag, but in open bulk, may be sold by a farmer to other farmers or gardeners, without the mark relating to the year when grown. The effect of this is that all dealers must sell their seeds through farmers, or be excluded from the market. The farmer may sell seeds, free from any restrictions or marks, but any one else selling the same kind of

seeds, even if from the same original mass or bulk, if the same be in packages or bags, must have plainly marked upon them the year when grown, the words that give purity to the contents, and eliminate all' fraud from the sale. This statute virtually prevents the importation into the State of North Carolina of all garden and vegetable seeds in paper packages or bags, for sale in the packages in which imported, and destroys that extensive and useful trade, so far as that State is concerned. If one State can do this, all can. If North Carolina can impose this burden, other States can and will impose similar or heavier ones, to the great damage of a commerce in which not only this petitioner and D. M. Ferry & Co. are interested, but in which many citizens of many of the States have invested their means, and to which they have devoted their time and energies."

The Sanders Case, if sound, is distinguishable from the one before us. As is pointed out in the opinion of the circuit judge who delivered it, on looking to its practical effect, the statute there under review would force all dealers to sell their seeds through farmers, who were at liberty to resell without restriction as to the use to which they were to be put, so that the seed might come on the open market and there compete on favored terms with other seeds.

It was made a matter of comment that the quantity to be sold by the farmers was not restricted, while here the quantity is practically limited, by the actual

need of the purchaser "for seeding by the purchaser himself." In other words, the opportunity is denied and not afforded for the seeds coming on the market in such competition. In the Sanders Case, sales could be made at any place in the State, whether in the market or elsewhere, and regardless of where the seller procured the seeds. Here the seed sold by him must be self-produced.

Looking broadly to the effect of the respective acts, in practical operation, on interstate commerce, we think differentiation is clear.

It is conceded on the brief of appellees that the act is expressly limited to sales made after seed coming from other States is at rest within this State, and that it does not purport to restrict sales of seed made from other States through interstate commerce. Such sales by farmer producers in other States are therefore unaffected; and it would seem that any handicap is the one imposed by the statute on the farmer producer of this State, when we view all such producers as components of a class. Reference to this fact is made to show that, so far as practical operation of the act is concerned, its interference with interstate commerce is inconsiderable; and it is essentially to such practical operation that the supreme court looks.

We waive any consideration of the question whether appellees have *status* to invoke the protection of the constitutional provision that has just been discussed.

III. The appellees contend that the act in question is unconstitutional because it is unreasonable and arbitrary in its terms.

With the legislative  departments rests the consideration and determination of the reasonableness of regulations under the police power, and a court will not examine the question *de novo* and overrule such judgment by substituting its own, unless it clearly appears that those regulations are so "beyond all reasonable relation to the subject to which they are applied as to amount to mere arbitrary usurpation of power" (*Lemieux* v. *Young,* supra) or is unmistakably and palpably in excess of the legislative power, or is arbitrary "beyond possible justice," bringing the case within "the rare class" in which such legislation is declared void.

In *Schmidinger* v. *Chicago,* 226 U. S., 578, 33 Sup. Ct., 182, 57 L. Ed., 364, Ann. Cas., 1914B, 284, an ordinance fixing the standard loaf of bread to be sold was upheld, the court saying:

"It is argued to make a loaf of the standard size of one pound, as required by the ordinance, would be extremely inconvenient at least, owing to changes and evaporation after the loaf is baked, and that to insure a loaf of full standard size it would be necessary to use twenty ounces of dough.  But inconveniences of this kind do not vitiate the exercise of legislative power.  The local legislature is presumed to know what will be of the most benefit to the whole body of citizens.  Evidently the council of the

city of Chicago has acted with the belief that a full-pound loaf, with the variations provided, would furnish the best standard. It has not fixed the price at which bread may be sold. It has only prescribed that the standard weight must be found in the loaves of the sizes authorized. To the argument that to make exactly one pound loaves is extremely difficult, if not impracticable, the supreme court of Illinois has answered, and this construction is binding upon us, that the ordinance is not intended to limit the weight of a loaf to a pound, . . . but that the ordinance was passed with a view only to prevent the sale of loaves of bread which are short in weight. Thousands of transactions in bread in the city of Chicago are with people who buy in small quantities, perhaps a loaf at a time, and, exercising the judgment which the law imposed in it, the council has passed an ordinance to require such people to be sold loaves of bread of full weight. We cannot say that the fixing of these standards in the exercise of the legislative discretion of the council is such an unreasonable and arbitrary exercise of the police power as to bring the case within the rare class in which this court may declare such legislation void because of the provisions of the Fourteenth Amendment to the Constitution of the United States, securing due process of law from deprivation by State enactments.''

See, also, *Hutchinson Ice Cream Co.* v. *Iowa,* 242 U. S., 153, 37 Sup. Ct., 28, 61 L. Ed., 28.

(a) Coming to one of the specifications of appellees: It is urged that section 11 contains a proviso that must bring the act to denunciation, under the above test, in that by it no one shall be convicted if he is able to show that weed seeds named in section 3 are present in quantities not more than 1 in 10,000, and that due diligence has been used to find and remove said seeds. It is said that it nowhere appears from the act that any process is known or practicable by which this provision may be conformed to. It is not necessary that the statute be incumbered with such data or matters in order to save it; and we cannot judicially know, and rule on a motion to quash, that no means or processes for thus testing seeds do not exist. If it be a fact that no such process or method exists, that is a matter for proof. "This record certainly does not present any data to make it certain that the discreton was arbitrarily exercised." *Heath & Milligan Mfg. Co.* v. *Worst,* supra. We think rather, seeing that the immediate effort is one to bar the sale of ten sorts of dangerous weed seed (as the 1 in 10,000,) and knowing the multiplying capacity and highly harmful character of such seeds, that we should read in the statute a legislative intent to bar them, even if other seeds accompany them, and that the legislature did conceive the harmful seeds to be fairly capable of separation or elimination. We confess that we do not see in the provision palpable capriciousness or merely arbitrary usurpation of power.

(b) The other provision asserted to be manifestly arbitrary is that portion of section 1, which requires labels on the packages to set forth the "locality where said seed was grown."

In several cases it has been held to be unreasonably arbitrary to require the place of production to be shown by placards, signs, or labels, but none of them is based on facts anyway to be likened to those of the case before us in the essential regard.

In *Ex parte Foley*, 172 Cal., 744, 158 Pac., 1034, and in *State* v. *Jacobson*, 80 Or., 648, 157 Pac., 1108, L. R. A., 1916E, 1180, it was held that it was not competent for the legislature of a State to require one selling eggs imported from a foreign country to display signs announcing that eggs offered for sale were imported or to stamp "imported" on the eggs. This, because imported eggs are not necessarily stale or unwholesome, and the advertising of such eggs as coming from some place without this country tends in no manner to protect the health of the public of the States of California and Oregon. On the contrary, the courts saw in the acts the purpose, scarcely covert, to discriminate against Canadian eggs, without affecting in like manner home-produced eggs, in an effort to counteract the customs duty act of the Congress of the United States, which admitted eggs from foreign countries without duty. Of course, the provisions of the respective acts having such a purpose were held void.

The case mainly relied upon by appellees is *Ex parte Hayden*, 147 Cal., 649, 82 Pac., 315, 1 L. R. A. (N. S.), 184, 109 Am. St. Rep., 183, in which it was held that a statute requiring the marketing of fruit when packed for shipment with the name of the immediate locality in which it was grown was invalid. The language of the court we think makes plain the inapplicability of the precedent in this case:

"It is a matter of common knowledge that this requirement would work the absolute destruction of certain important branches of industry. Dried fruit, such as prunes, peaches, and apricots, are gathered in establishments in enormous quantities from the State over. These fruits when dried are assorted by grade and quality, and thus assorted and packed are shipped to the uttermost parts of the earth. It would absolutely prohibit this industry if these fruit driers were compelled to label each package with the names of the localities from which the fruit came, and if it did not absolutely prohibit it, it would render their business so onerous, complicated, and expensive as seriously to imperil its existence. It is plain, therefore, that the act was not designed to prevent either false labeling or the shipping of diseased fruit, and, if so designed, it is both meaningless for this purpose and burdensome for all others. It seems quite apparent that the true purpose of the act was to obtain for the fruit raisers of some well-advertised and favored localities an advantage in the disposition of their own fruit. But

this, for reasons well elaborately set forth in *People v. Hawkins,* 157 N. Y., 1, 51 N. E., 257, 42 L. R. A., 490, 68 Am. St. Rep., 736, forms no part of the police power, and is wholly beyond the prerogative of the legislature.''

The act under review does not require the ''immediate locality'' to be set forth, but only the ''locality,'' which we construe to mean State or country where produced. We do not judicially know that in the ordinary conduct of business the requirement is an impracticable one, and certainly the labeling as required does bear a proper relation to the subject-matter regulated. It is not unreasonable, not to say arbitrary, to require that in regard to blue-grass seeds, for example, it be shown whether they come from Kentucky or from Canada, as furnishing some aid to the purchaser whose desire is to buy Kentucky blue-grass seeds, as better suited to the soil and climate of this State.

Bearing upon this insistence of appellees, attention is directed to the fact that the Congress, proceeding under the interstate commerce clause of the national Constitution, in section 8 of the pure food law, itself competently regulates the labeling of food products in respect to a showing of the State, territory, or country in which it is produced. *Scharubstadter v. U. S.,* 199 Fed., 568, 118 C. C. A., 42. The label, it is said, may be false and misleading to purchasers, as to the place of production. If the federal Congress may so regulate reasonably interstate com-

State v. McKay.

merce, why may not the legislature under the police power in like manner regulate the sale of seeds until such a time as the Congress assumes jurisdiction to regulate commerce in that particular commodity?

The act, therefore, stands under all the tests so applied to it. The trial judge erred in sustaining the motion to quash. Reversed, and remanded for further proceedings, in which it will be open to the accused to introduce proof touching the reasonableness of the provisions of section 11 of the act.