BOWEN *v.* HANNAH *et al.*

(*Nashville,* December Term, 1933.)

Opinion filed May 19, 1934.

452

K. C. LARKEY, of Memphis, for appellants.

ROY H. BEELER, Attorney-General, and EDWIN F. HUNT, Assistant Attorney-General, for appellee.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

This suit was brought under the Declaratory Judgments Act to test the constitutionality of section 13 of chapter 119, Public Acts of 1933, which is the general act now in force regulating the use of public highways. Complainant, Bowen, operates in Memphis what is defined in the act as a motor transportation agency, which occupation is regulated by the provisions of section 13 in three particulars of which complaint is made, as in violation of rights secured by (1) article 1, section 8, of the State Constitution, (2) the Fourteenth Amendment to, and (3) the commerce clause of, the Federal Constitution. The chancellor overruled a demurrer and so decreed, and the defendant state officials appeal.

No charge of discrimination between persons in similar occupations, or of unreasonable classification, appears to be presented. The chancellor held the challenged section void as an arbitrary and unreasonable exercise of the police power, and this is the determinative issue. If the police power has been reasonably exercised, then the constitutional provisions against abridgment of privileges and immunities, and denial of due process and equal protection, found in the Fourteenth Amendment; and disseizure of privileges, or deprivation of property, in section 8, article 1, of the State Constitution, are not violated.

Section 1 of the act defines the term "motor transportation agent" as used in the act, and the term as so defined applies to the complainant herein.

The following excerpts from the act are made the basis of attack:

"Section 13. (a) The Railroad and Public Utilities Commission is hereby vested with power and authority, and it shall be its duty to license and supervise motor transportation agents and motor freight brokers in this State, in all matters affecting the relationships between such motor transportation agents and/or motor freight brokers, their customers, and the public.

"(b) It is hereby declared unlawful for any motor transportation agent and/or motor freight brokers, as defined in this Act, to carry on such business or act in such capacity, unless and until he or it shall have first procured a license from the Commission as herein provided and shall have complied with all the requirements of this Act.

"(c) All persons who, on the effective date of this Act, shall in good faith be acting as motor transportation agents, shall within sixty days after such effective date apply to the Commission, in writing, for a license to operate as such under this Act, and shall accompany such application with a remittance in the sum of fifty dollars. Upon the filing of such application, the Commission shall set a date for a hearing thereon, and shall give at least ten days notice thereof to the officers or owners of any common carriers of passengers operating in the territory in which the applicant proposes to operate, and to any other person who, in the opinion of the Commission, may be properly interested in such application; and such common carriers of passengers or other persons are hereby declared to be interested parties, and may offer testimony for or against the issuing of such license. In determining whether such license shall be issued, the Commission shall give reasonable consideration to the financial responsibility and character

of the applicant, the nature and safety of the actual agencies of transportation employed or customarily procured by applicant, the financial responsibility and character of the owners of such agencies of transportation, the nature of the highways over which such agencies of transportation are procured to be employed and the effect thereon and upon the traveling public using such highways, the effect such transportation may have upon other transportation service being rendered, and all other pertinent facts. If, upon hearing, the Commission shall determine that the applicant is a fit and proper person to act as motor transportation agent and that any motor carriers through which the applicant proposes to sell transportation have complied and are then and there complying with all laws and with all proper rules and regulations applicable to their respective cases, the license shall be issued. Provided, however, that before such license shall be issued, the applicant for license (1) shall deliver to the Commission and maintain continuously in force and effect a bond in the sum of one thousand dollars executed by the applicant, as principal, and as surety by a bonding or insurance company satisfactory to the Commission and authorized to do business in this State, in such form as the Commission may prescribe, for the protection, use and benefit of any person or persons who shall suffer loss or damage by reason of the failure of any person or motor carrier, through whom transportation may be arranged or over which tickets may be sold by the applicant, to properly fulfill any contract or agreement for such transportation which may have been negotiated by the applicant, and (2) shall also deliver to the Commission and maintain continuously in force annd effect a policy of liability insurance

in an insurance company satisfactory to the Commission and authorized to do business in this State, in an amount and in form satisfactory to the Commission, undertaking to pay for injuries or damage to persons or property by reason of the negligent operation of any person or motor carrier, actually furnishing transportation which may have been negotiated for or procured, or for which tickets may have been sold by the applicant. In the event of the lapse of such bond or policy of liability insurance, any license which may have been issued to the applicant shall be forthwith revoked. In the event that a license is issued pursuant to such application, the deposit of fifty dollars required to accompany such application, shall be turned over by the Commission to and become a part of that 'Motor Vehicle Account' hereinafter provided for; but if such application for license be denied, such deposit shall be returned to the applicant. Any license, or renewal license, issued pursuant to this subsection (c) shall expire on the 31st day of December of the calendar year in which issued, and shall thereafter be of no further force or effect; provided, however, that on or before such expiration, an application, accompanied by a further deposit of twenty-five dollars by way of license fee, may be made for the renewal thereof, and said license may thereupon be renewed by the Commission; but the Commission may, in its discretion, order a hearing upon such application for renewal and for proper reason may refuse to renew same. The license of each motor carrier transportation agent shall be conspicuously displayed in the office of such motor carrier transportation agent. No license issued hereunder shall authorize the licensee to do business except from the location stipulated in the license;

notice in writing shall be given to the Commission of any change of business location by any license, whereupon the Commission shall issue a new license for the unexpired period for the new location without additional charge; but any changes of business location, without notice to the Commission, and the issuance of a new license, shall automatically cancel the license theretofore issued.

"The Commission may suspend or revoke any license theretofore issued if it shall determine, upon notice to the licensee, and after hearing, that such motor carrier transportation agent is not a fit person, firm or corporation to hold such license or has violated the laws of the land or the proper rules and regulations of the Commission, or has sold, offered for sale, or negotiated for sale, transportation by any carrier that has violated or is not complying with the laws of this State or the proper rules and regulations of the Commission. It shall be the duty of all motor carrier transportation agents to maintain and keep for a period of one year an exact and permanent record of all transactions had by them as such agents, including the name and address of the person transported, the amount paid, the point of destination, the name of the person, firm or corporation acting as carrier, and the name and address of the insurance company carrying liability insurance for such carrier, the records so required to be kept, be at all times open to inspection by any representative of the Commission."

As will be seen, this section of the act purports to regulate the business defined therein, that of conducting for profit an intermediary agency between would be travelers over our public highways and operators of automobile vehicles other than common carriers. The

act designates persons conducting such a business as motor transportation agents and requires that they (1) obtain a license from the state utilities commission, (2) give bond for protection of persons who may suffer loss by reason of the failure of persons contracting to transport them to fulfill such contracts, and (3) give bond to cover loss by negligent operation of the vehicles employed.

The subject dealt with is illustrative of those new problems springing out of modern developments and conditions, to which it becomes necessary to apply age-old principles, as new demands arise. The flexible and comprehensive doctrine of the police power is justifiably invoked, as it may always be for the public safety and welfare in the protection of personal and property rights. Those occupations which are inherently subject to misuse, out of which may readily come oppression and fraud and crime, may not only be regulated, hedged about with safeguards, as a condition of their doing, but may be altogether prohibited, in the wisdom of the Legislature, in exercise of the police power. A familiar illustration is afforded by the strict regulations enacted of the occupation of pawnbroker (Code, sections 6744-6750) ; and, again, of junk dealer (sections 6751-6755). Also, of dealers in secondhand automobile tires and accessories (sections 6756-6758). Questions here raised of the impairment of the obligation of contracts and taking property without due process of law have been made as to these more or less stringent regulations of these businesses, but unavailingly. The validity of the junk dealer regulatory statutes was recently upheld by this court in *State* v. *Legora,* 162 Tenn., 122, 34 S. W. (2d), 1056, and in the opinion in that case the pawnbroker statutes were inci-

dentally approved. Prevention of the crime of theft was particularly noted as the basis in these statutes. The principle applied may well be extended to the case now before us. It is a matter of common knowledge that danger to life and limb and property is attendant upon the practice of conveying unknown and unvouched for persons, or being conveyed by them, in automobiles over the highways. This is especially true when the distances are considerable, through long stretches of sparsely settled districts. Prudent drivers no longer follow the practice of yielding to solicitations for transportation from strangers. And prudent travelers are wary of accepting invitations from strangers for such transportation. The opportunities afforded for holdups, robbery, kidnapping, and impositions of many kinds are unlimited, and illustrations of such happenings are common.

Why then was it not only the privilege, but the duty of the Legislature to regulate most strictly the business of the intermediary who proposes to make a profit out of bringing together persons who seek to transport and be transported under such conditions? What is known as "hitch hiking" is prohibited altogether by many ordinances and some statutes. These laws prohibit direct solicitation of such engagements, as conducive to danger to the parties affected and a public menace. If one desires to exercise the privilege of holding himself out to the public as a medium through whom negotiations may be had for such transportation, with its manifest elements of danger already indicated, why should he not be required, first, to make a satisfactory showing of character and responsibility, and, second, to guarantee by indemnity bond that the carriers for whom he contracts will perform in good faith and with reasonable

care? The effect is only to limit his dealings in this hazardous enterprise to those for whose integrity he can vouch, and of whose responsibility against recklessness he is sufficiently assured, by indemnity insurance, or otherwise. In view of the nature of the occupation he has chosen, wide discretion is vested in the Legislature to determine the extent and character of the restrictions proper to be applied.

It is insisted that the requirements in the act for bonds are impossible of compliance, and therefore prohibitive, in effect, of the business, thus depriving the complainant below of property rights. If such requirements are essential to protection from the danger inherent, then, nevertheless, it is within the police power to prescribe them, since, if the business cannot be safely conducted, it may be prohibited altogether. And this court has recently declared that "exercise of the police power, otherwise valid and constitutional, cannot be defeated because property rights are taken or destroyed." *Spencer-Sturla Co.* v. *City of Memphis,* 155 Tenn., 79, 290 S. W., 608, 611. And see *Theilan* v. *Porter,* 14 Lea (82 Tenn.), 622, 25 Am. Rep., 173; *Illinois Cent. R. Co.* v. *Moriarity,* 135 Tenn., 458, 186 S. W., 1053. In Williams' recently published and excellently Annotated Code of Tennessee, under section 8, article 1, of our Constitution subhead "Police Power," the learned annotator thus summarizes the holding of this court in *State* v. *McKay,* 137 Tenn., 280, 193 S. W., 99, 105, Ann. Cas., 1917E, 158:

"With the legislative departments rests the consideration and determination of the reasonableness of regulations under the police power, and a court will not examine the question *de novo* and overrule such judgment by substituting its own, unless it clearly appears that those

regulations are so 'beyond all reasonable relation to the subject to which they are applied as to amount to mere arbitrary usurpation of power,' . . . or is unmistakably and palpably in excess of the legislative power, or is arbitrary 'beyond possible justice,' bringing the case within 'the rare class' in which such legislation is declared void.''

In *Motlow* v. *State,* 125 Tenn., at page 571, 145 S. W., 177, 183, L. R. A., 1918F, 177, MR. JUSTICE NEIL quotes *Crowley* v. *Christensen,* 137 U. S., 86, 90, 91, 11 S. Ct., 13, 34 L. Ed., 620, for the proposition that, ''As it is a business attended with danger to the community, it may, as already said, be entirely prohibited, or be permitted under such conditions as will limit to the utmost its evils.'' The principle thus enunciated has reference not alone to the sale of liquor then under consideration, but whenever danger to property or person can be reasonably apprehended as incident to the occupation or business. Illustrating the power of the Legislature to destroy rights of property under the police power, MR. JUSTICE NEIL cites the destruction of houses, when in condition to endanger the health and safety of the public (*Theilan* v. *Porter,* 14 Lea [82 Tenn.], 622, 52 Am. Rep., 173); to prohibit, in the interest of morals, publication and sale of obscene books, or pictures; the keeping of game tables; dealing in margins on stock exchanges, or the purchase and sale of ''options,'' or ''futures;'' operation of lotteries or gift enterprises; and the Legislature may forbid sales of stocks of merchandise in bulk, without first taking inventories and giving notice, thus directly restricting an owner of goods in the right to sell his own. He cites the opinion of MR. JUSTICE HARLAN (*Mugler* v. *Kansas,* 123 U. S., 623, 8 S. Ct. 273, 31 L. Ed., 205),

for the general rule that, "the right to manufacture, sell, and use articles of trade is conditioned upon the fact that such conduct does not deleteriously affect the rights of the public; that, if any business becomes prejudicial to the welfare of the community, society has the right to protect itself against such injurious consequences; that the Legislature of the State has the right to determine what measures are appropriate or needful for the protection of the public morals, health, and safety, and, unless a statute has no real or substantial relation to these objects, the courts cannot interfere."

The danger that fraud may readily grow out of a business or practice is generally recognized as a basis for the exercise of the police power in regulation, restriction, or prohibition. That "the prevention of fraud in general has always been recognized as well within the police power" is shown, by reasoning and freely cited authority, in the opinion of CHIEF JUSTICE SHIELDS in *State* v. *Co-operative Store Company,* 123 Tenn., 399, 131 S. W., 867, 868, Ann. Cas., 1912C, 248, upholding an act (chapter 482, Acts 1905) to prevent fraud in the sale of corn meal in packages. The recognized principle, as already indicated, is that whenever any given occupation, business, trade, custom, or practice apparently has inherent within it the germs of fraud or danger to public safety, whenever it affords a plausible cover for practices which may so result, the Legislature may, in its discretion, in exercise of the police power, regulate, or restrict it, or, if found necessary for complete protection, prohibit it altogether. The greater power includes the lesser, and since the occupation here involved might, in our opinion, be lawfully prohibited altogether by the Legislature, there remains little room to question the

nature of the restrictions and regulations imposed by the act.

██ But, these insurance requirements do not appear to be impossible of performance. They merely attach to the conduct of this peculiar business an element of risk common to all insurable obligations. This risk is measured by the care taken in the selection of the parties brought together, and is conceivably coverable, in application of the law of averages, by the rates charged for the service rendered. The chance of liability falling on the broker under the first provision for indemnity, if good faith is exercised, is small and may be reasonably guarded against by due care in the selection of the carrier. And if the broker but sees to it that the carrier has ample accident insurance in the usual form, the liability under the second bond requirement is minimized. Fo · the reasons indicated, we are not of opinion that the act is subject to the attacks made upon it.

While much might be said in support of the theory that the regulations are within the power of the State as proprietor of its highways, in view of the conclusion reached applying the police power, discussion of this phase becomes unnecessary.

██ Also, since the statute is held to be an exercise of police power applied to a business conducted wholly within this State, we are not of opinion that the commerce clause of the Federal Constitution is contravened. Such local police regulation is not invalid because it may incidentally affect interstate commerce. *State* v. *McKay, supra.* The general rule, announced by the Supreme Court of the United States, is that laws of states enacted in the proper exercise of police powers will not be held

unconstitutional because they may indirectly or remotely affect interstate commerce. *Silz* v. *Hesterberg,* 211 U. S., 31, 29 S. Ct., 10, 53 L. Ed., 75.

The recent opinion of MR. JUSTICE BRANDEIS, in *Bradley* v. *Public Utilities Commission,* 289 U. S., 92, 53 S. Ct., 577, 578, 77 L. Ed., 1053, 85 A. L. R., 1131, appears to answer, in principle, the challenge made of this act as in violation of the commerce clause of the Federal Constitution. For example, he says: "Protection against accidents, as against crime, presents ordinarily a local problem. Regulation to ensure safety is an exercise of the police power. It is primarily a State function, whether the locus be private property or the public highways. Congress has not dealt with the subject. Hence, even where the motorcars are used exclusively in interstate commerce, a state may freely exact registration of the vehicle and an operator's license" (citing numerous cases). And, with application by analogy to the instant case, "may require carriers to file contracts providing adequate insurance for the payment of judgments recovered for certain injuries resulting from their operations. *Continental Baking Co.* v. *Woodring,* 286 U. S., 352, 365, 366, 52 S. Ct., 595, 76 L. Ed., 1155, 81 A. L. R., 1402."

It results that the decree below must be reversed, and judgment entered sustaining the constitutionality of the act.