## MARTIN et al. v. RAILROAD COMMISSION OF TEXAS et al.

### No. 8476.

Court of Civil Appeals of Texas. Austin.

April 1, 1936.

Rehearing Denied April 29, 1936.

Yelderman & Yelderman, of Austin, for appellants.

Wm. McCraw, Atty. Gen., and Curtis E. Hill, Asst. Atty. Gen., for appellees Railroad Commission of Texas et al.

Price & Christopher and Wm. E. Dahl, all of Fort Worth (Hornsby & Hornsby, of Austin, of counsel), for other appellees.

BAUGH, Justice.

This suit was brought by appellants, 15 in number, operators of travel bureaus in various cities in Texas, attacking as unconstitutional Senate Bill No. 265, Acts 44th Leg.1935, Reg.Sess., c. 325, p. 746 (Vernon's Ann.Civ.St. art. 911c, § 1 et seq., and Vernon's Ann.P.C. art. 1690c). Suit was against the Railroad Commission, its agents and employees, to enjoin them from enforcing said law. Trial was to the court without a jury upon the merits, and the injunction denied, but the temporary restraining order theretofore granted against appellees was continued in force pending appeal. Upon motion filed by appellees, the trial court made and filed findings of fact and conclusions of law.

Section 1 of said act defines "transportation agent." This definition clearly includes the businesses of appellants as conducted by them.

Section 2 of the act provides certain exemptions from its provisions, including "common carriers" already regulated by law.

Section 3 authorizes and directs the Railroad Commission to license and supervise such agencies and the conduct of their business.

Section 4 makes it unlawful for such agents to do business without a license from the Railroad Commission.

Section 5 provides the methods and fees for obtaining such license, what the Railroad Commission should take into consideration in granting same, and requires that such applicant for a license:

"(1) Shall deliver to the Commission and maintain continuously in force and effect a bond in the sum of One Thousand ($1,000.00) Dollars, executed by the applicant, as principal, and as surety by a bonding or insurance company satisfactory to the Commission and authorized to do business in this State, in such form as the Commission may prescribe, for the protection, use and benefit of any person or persons who shall suffer loss or damage by reason of the failure of any person or motor carrier, through whom transportation may be arranged or over which tickets may be sold by the applicant, to properly fulfill any contract or agreement for such transportation which may have been partially or wholly negotiated by the applicant.

"(2) In the event transportation is contracted through the influence, efforts, activities, information or directions of the said transportation agent, the contracting carrier shall have on file with the Railroad Commission of Texas adequate bonds and/or insurance policies; and the transportation agent contracting, influencing, giving information or direction to the contracting carrier agent to prospective passengers, shall request of the contracting carrier or carriers to exhibit to the said transportation agent a certificate from the Railroad Commission of Texas certifying that such contracting carrier or carriers has on file in the Railroad Commission office adequate bonds and insurance policies, and it shall be the duty of the contracting carrier or carriers to exhibit to such transportation agent such certificate before any attempt is made to transport any person or persons intending to be transported by such contracting carrier or carriers, and it is further provided, that in any instance the transportation agent permits any person or persons or permits the contracting carrier to transport any person or persons who has not filed with the Railroad Commission of Texas a public liability bond, or insurance policy, such transportation agent shall be guilty of a misdemeanor and, upon conviction, shall be fined not less than One Hundred ($100.00) Dollars and not more than Five Hundred ($500.00) Dollars. The amount of such policy or policies of insurance shall be fixed by the Commission by general order or otherwise, and the terms and conditions of said policy or policies covering such motor vehicles are to be such as to indemnify the applicant against loss by reason of any personal injury to any person or loss or damage to the property of any person other than the assured and his employees. Such policy or policies shall furthermore provide that the insurer will pay all judgments which may be recovered against the insured motor bus company based on claims for loss or damage from personal injury or loss of, or injury to, property occurring during the term of said policy or policies and arising out of the actual operation of such motor car, and such policy or policies shall also provide for successive recoveries to the complete exhaustion of the face amount thereof, and that such judgments will be paid by the insurer irrespective of the solvency or insolvency of the insured. Such liability and property damage insurance as required by the Commission shall be continuously maintained in force on each and every motor propelled vehicle while being operated in such service."

Section 6 provides that the commission retain the $50 to be deposited by applicant with his application for license, whether same be granted or not; for an annual license tax of $25; and that such license be conspicuously displayed in such agent's place of business.

Section 8 provides for keeping of records by such agent of all his transactions.

Section 9 provides for enforcement by the commission of the act.

Section 10 (Vernon's Ann.P.C. art. 1690c) provides penalties by fine or imprisonment, or both, for violations of the act.

Section 11 (Vernon's Ann.Civ.St. art. 911c note) repeals all laws in conflict therewith.

Section 12 (Vernon's Ann.Civ.St. art. 911c note) provides that, if any portion of the act be declared unconstitutional, such invalidity shall not affect the remaining portions of the act.

And section 13 recites: "The fact that there are many transportation agents, as described by this Act, operating in the State of Texas, wholly without regulation of any sort by any branch of our State Government, and the fact that in many in-

stances such transportation agents are operating in such manner as to provide a danger to the public health and morals of the people of this State, creates an emergency and an imperative public necessity that the Constitutional Rule requiring Bills to be read on three (3) several days in each House be suspended and same is hereby suspended, and that this Act shall take effect and be in force from its passage, and it is so enacted."

The act is attacked as unconstitutional, particularly on the grounds: (a) Because it destroys appellants' liberty of contract in violation of article 1, § 19, of the Constitution of Texas; (b) because owners of private automobiles not engaged in the business of transporting passengers for hire are not subject to regulation, directly or indirectly, as provided in the act; (c) because it imposes upon appellants, and their patrons who are private individuals, not engaged in the carrier business, such regulations as are imposed upon common carriers; (d) because a large per cent. of the passengers served by appellants are carried interstate by such travel; (e) because it discriminates between appellants and others who obtain cotravelers on a share-the-expense basis of travel; and (f) because the Legislature cannot by an arbitrary definition make appellants transportation agents, when they are not in fact such agents.

Theoretically the basis on which such travel bureaus operate is merely that of an information agency or service for which they charge a fee; that is, a prospective passenger who desires to make a trip lists with such agency his name, address, time of departure, and point of destination. A car owner intending to make a trip and desirous of having company or some one to accompany him who is willing to help bear the expenses of such trip likewise lists with such agency similar information. The agency, in turn, with this information from both parties, merely brings them together and they make their own arrangements. Either party is entirely free to accept or reject either a carrier or a passenger as he sees fit, and, if accepted, upon such terms as may be satisfactory to themselves. For this service the agency collects a fee from the passenger. Manifestly, if properly conducted, such service is a legitimate undertaking and may often be a public convenience.

However, the manner in which such agencies have come to be conducted has given rise to such evils that the Legislature has seen fit to regulate them.

Appellants attack some of the findings of fact of the trial court as to the methods of operation of such agencies as being without any evidence to support them. We have accordingly carefully read the statement of facts, and hereinafter set out portions of the trial court's findings which have support in the evidence. These findings are:

"2. While plaintiffs assert in their petition that their business is confined to the act of bringing together persons who desire to make a trip in a private automobile wherein the owner and operator of the car and the passenger or passengers taken on are actually destined for the same town or city (such trip to be made on what is called a share-the-expense plan), yet I find from the evidence that in fact the business of plaintiffs, as well as that of the class to which they belong, goes much farther. The plaintiffs each maintain offices and each office or place of business carries a sign, 'Travel Bureau' or 'Travel Club' or some other similar name or designation. In some instances they publish or make public advertisements showing destinations, and rates of charge for transportation per passenger to such point or destinations. While it may be that in the beginning of the activity of Travel Bureaus the business was confined to that of acting as broker, agent, or intermediary between purely private persons, yet the business has developed to the stage where, as a matter of fact, as now operated such travel bureau agencies, for all intents and purposes are similar in actual operation to the business carried on in a regular common carrier motor bus depot, or railway passenger station. Plaintiffs charge prospective passengers and collect from them what is called a fee for the service of the Travel Bureau. In many instances, and as indicating that the Travel Bureau has knowledge beforehand concerning what the owner of the car will charge, the Travel Bureau makes known to the prospective passenger what it will cost him from one point to another.

"3. I find as a fact that the transportation agent actually quotes given fares and charges from point to point."

"5. Although it is alleged that the transportation agent requires an exchange of references, I find as a fact that no exchange

of references is ordinarily required, but that prospective passengers are put in cars with drivers when both the passenger and the driver are wholly unknown to each other.

"6. I find as a fact that passengers are often stranded by drivers of cars to whom the transportation agent has delivered the passenger for transportation away from home or destination and friends and left to complete the journey any way they can.

"7. I find that passengers are often started on their journey with the promise of transportation to a given point for a given fare and are thereafter required to pay for gasoline or for other costs of the journey because the driver is broke and cannot make the journey—all in violation of the transportation agent's agreement.

"8. I find as a fact that it is often represented that a direct journey will be made to destinations whereas it often occurs that circuitous routes are taken with many hours delay en route.

"9. I find that it often occurs that a passenger is taken to some point short of his destination and left there without the journey being completed."

"11. There has developed a class of persons, and these persons deal with plaintiffs in this suit, who own and operate automobiles or motor vehicles, have no destination themselves personally but are engaged regularly in going from travel bureau for the purpose of picking up prospective passengers and carrying them for hire to various points of destination. This class of persons have no permits or certificates of convenience and necessity to carry passengers for hire over the highways of the State of Texas, and neither do they have any insurance to protect their passengers in case of injury to the passenger's person or property. In many instances, these owners and operators of motor vehicles who operate to and from various travel bureaus of the State are transient and for the most part are wholly unable to respond in damages for any wrong done by them, and in many instances they are irresponsible, undependable, and dangerous persons."

"12. I find from the evidence adduced in this case that on account of the irresponsibility in some instances of travel bureaus and in some instances of the operators of motor vehicles who frequent travel bureaus for the purpose of obtaining passengers, that irregularities, abuses, and injuries toward the traveling public have arisen which makes the operation of such bureaus dangerous and injurious to the welfare, health, morals, and safety of the general public."

"I find from the evidence that under the practices obtaining, often times, unattended and unprotected passengers are committed to the care and keeping of drivers and operators of cars who are wholly irresponsible and untrustworthy in instances where the passenger desires to make long trips through long stretches of comparatively sparsely settled country."

From these findings the trial court concluded that such business was impressed with a public interest; that the evils to which it gave rise were such that the Legislature could have prohibited it under the police power of the state, and consequently had the power to rigidly regulate it; and that the effect on interstate travel was but incidental to the exercise of such police power over it.

The cases are legion construing the provisions of the State and Federal Constitutions (Const.Tex. art. 1, § 19; Const.U.S. Amend. 14) guaranteeing to the citizen the right of freedom of contract and to pursue a lawful business. But the question as to when a business or an occupation, either inherently, or as a result of the manner in which it is conducted, becomes effected with a public interest, is one primarily for the Legislature to determine. The courts are not concerned with the wisdom of such legislative determination, but only with the question of whether or not the regulation is reasonable as applied to the business or occupation affected, and whether such legislative regulation runs counter to constitutional guaranties. A business, entirely legitimate at its inception, may in time, because of the habitual manner in which it comes to be conducted, give rise to such evils, vices, or dangers as to affect the safety, health, comfort, or welfare of the public. When it does so, it becomes subject to regulation, or, if necessary, to prohibition by the state under its police power. And in determining this question it will be presumed that the legislature is cognizant of the manner and circumstances under which such business or occupation is carried on; that is, in the instant case, it must be presumed that the Legislature, when it enacted the law here attacked, knew generally the facts relative to such business disclosed by the evidence in this case and substantially as found by the trial court. Under the facts recited, we think it is manifest that the Legislature was

clearly authorized to regulate appellants' business.

Appellants in large measure rely upon the case of Ex parte Martin, 74 S.W. (2d) 1017, wherein the Court of Criminal Appeals held unconstitutional an act of the Forty-Third Legislature, First Called Session, c. 114, p. 316 (Vernon's Ann.P.C. art. 827d), undertaking to regulate, and in effect prohibiting, the same business or occupation as the Act herein attacked. But a different situation is here presented. The Act there attacked in effect prohibited such travel bureaus from bringing together passengers with any carrier except a carrier for hire who had complied with all the laws of the state and regulations of the Railroad Commission governing common carriers. It is true that in the instant case that portion of paragraph (2) of section 5 of the act (Vernon's Ann.Civ. St. art. 911c, § 5(2), requiring such agent not only to himself execute a bond and carry insurance, but to see to it that the proposed carrier of a passenger also has on file with the Commission an indemnity and public liability policy, is practically a verbatim copy of a portion of section 11 of Article 911a, Vernon's Ann.Civ.St., governing motor carriers for hire. But numerous other requirements of Article 911a relative to such common carriers are not made to apply to such individuals as patronize travel bureaus. While it is true that the practical result of such a requirement of the private car owner may be to destroy, in effect, the business of appellants, in that owners or operators of private cars, on share-the-expense basis, would not be willing to go to such added expense and trouble, in view of the fact that such agencies, in furnishing for a fee the service they assert the right to render, constantly bring together strangers, or bring passengers in contact with habitual patrons who in effect operate for hire, with the result that the passenger, even though he make his own arrangement with the driver, is frequently imposed upon or defrauded, we are not prepared to say that such a requirement is unreasonable. If, in the judgment of the Legislature, it becomes necessary to prohibit the operations of such agencies altogether in order to prevent fraud upon its patrons, or to protect the safety and welfare of the public, the Legislature clearly has the power to do so. And, if the regulation deemed necessary by the Legislature to eliminate abuses, prevent fraud, and to properly give such protection even results in effectual prohibition of such occupation or business, it cannot be stricken down for that reason.

The act here involved is very similar to that enacted by the Legislature of Tennessee regulating the same kind of agencies, and attacked largely on the same grounds asserted in the instant case. The only material difference between the Tennessee act and the Texas act is that in the Tennessee act the agency regulated was required to furnish the indemnity and liability insurance to protect the passenger; whereas, in the Texas act, the agent or bureau must require of the carrier evidence of such protection offered by him before the agent is authorized to deal with such carrier in bringing him and the passenger together. The Tennessee act was before the Supreme Court of that state in Bowen v. Hannah, 167 Tenn. 451, 71 S.W.(2d) 672, and in an able and well-considered opinion was sustained as a valid exercise of the police power of the state. The reasoning and holding in that case, wherein numerous cases both state and federal are reviewed and applied, is, we think, cogent and sound; and equally applicable to the case at bar. We particularly refer to that case and the discussion there made as applicable here without the necessity of extended discussion of the issues raised in the instant case.

The act nowhere interferes with or attempts to regulate private car owners themselves in making any arrangements they may see fit for transporting passengers on a share-the-expense basis. Nor does it attempt to make the appellants common carriers. It merely regulates their modus operandi, and fixes requirements they must meet as a prerequisite to their right to carry on such business. The act is, we think, under the facts shown, a valid exercise of the police power of the state.

The judgment of the trial court refusing the injunction is affirmed.

Affirmed.