[Civil No. 4167.   Filed November 27, 1939.]

[96 Pac. (2d) 277.]

H. L. FRANCIS, EDDY COBB, SAM J. SALYER, CLYDE CHESNUTT and JOE LAWRENCE, Appellants, v. W. T. ALLEN, Superintendent of State Highway Patrol; B. H. McAHREN, Superintendent of Motor Vehicle Division of State Highway Department; WILSON T. WRIGHT, AMOS A. BETTS and W. M. COX, Members of Arizona Corporation Commission, Appellees.

Mr. L. C. McNabb and Mr. Elmer Graham, for Appellants.

Mr. Joe Conway, Attorney General, Mr. A. R. Lynch and Mr. E. P. Cline, his Assistants, for Appellees.

LOCKWOOD, J.—This is an action by H. L. Francis and others, hereinafter called plaintiffs, against W. T. Allen, as superintendent of the state highway patrol, and other state officials, hereinafter called defendants, seeking to enjoin the latter from attempting to enforce the provisions of chapter 50 of the regular session laws of the fourteenth legislature, 1939, being an act relating to motor vehicle transportation, and asking for a declaratory judgment as to the rights and status of the parties under said act.

Defendants demurred to the complaint, on the ground it did not state a cause of action, and the demurrer being sustained, and plaintiffs declining to amend their complaint, judgment was rendered in favor of defendants, whereupon this appeal was taken.

The first and, indeed, the primary question for our consideration is the constitutionality of said chapter 50, *supra.* We shall summarize the act, rather than quote it in full, except so far as it may be necessary to give its exact language.

Section 1 defines "motor carrier" as meaning any person who transports or offers to transport persons by motor vehicle for compensation, without being au-

thorized or required by law so to operate. "Motor carrier transportation agent" is defined as a person who acts as an intermediary between the public and a motor carrier in arranging for transportation.

Section 2 provides that no person shall act as a motor carrier transportation agent without first obtaining a license from the corporation commission.

Section 3 sets forth the form of the application for such license.

Section 4 provides:

"If an applicant for an agent's license is found, after hearing, to be unfit to properly perform the services proposed and to conform to the provisions of law with regard thereto, the commission shall deny the application.",

and then states what the license shall contain, if it is granted.

Section 5 fixes the fee for the license at one hundred dollars per year.

Section 6 provides for the suspension and revocation of the license if the agent

"1. engaged in false advertising or false representations; 2. arranged for, sold, offered for sale, or has negotiated for sale, transportation by any carrier not authorized by the Arizona corporation commission or the interstate commerce commission to carry on the business of a common carrier, which is conducting its business in a manner contrary to public interest or in violation of law or an order, rule, or regulation of the commission, or, 3. violated any provision of this act, or any federal enactment, rule or regulation."

Section 7 provides that a bond of ten thousand dollars be given by the agent "conditioned upon the faithful performance of any undertaking as a motor carrier transportation agent", and permits any person injured by breach of the condition of the bond to sue thereon.

Section 8 provides for records to be kept by the agents.

Section 9 sets forth what shall constitute acting as an agent.

Section 10 fixes the penalty for acting as an agent without license, or violating the conditions of the license, as a misdemeanor.

Section 11 excepts certain classes of transportation from the act.

Section 12 declares it to be the duty of the superintendents of the Arizona highway patrol and the motor vehicle division of the state highway department to enforce the act.

Sections 13 and 14 state that the provisions of the act are severable, and declare an emergency.

It is evident, upon a careful examination of the act, that it is an attempt to regulate by law what are commonly called "travel bureau agents", meaning thereby persons who bring together the traveling public and the operators of motor vehicles who are not engaged in business as regularly licensed common or private carriers for hire.

The first question is whether it is within the power of the legislature to regulate such business, and the second, if so, whether the regulations adopted are unreasonable and arbitrary.

Generally speaking, the question as to when a business or occupation, whether inherently or as a result of the manner in which it is conducted, is subject to regulation by the legislature, is one primarily for that body to determine. The courts are not interested in the question as to the wisdom of such regulation, but only whether the regulation runs contrary to constitutional guaranties, and whether it is arbitrary and unreasonable. There is business which is entirely legitimate ordinarily, but it may become, because of the manner in which it is carried on, a cause of such

evils, vices and dangers as affect the safety, health, comfort or welfare of the public. When it has this effect, it is subject to regulation, or even to prohibition, by the state under its police powers, and in determining when the necessity for such regulation or prohibition arises, it will be presumed that the legislature knows the manner in which the business is carried on and believes that the necessity for regulation has arisen. *Martin* v. *Railroad Com. of Texas*, (Tex. Civ. App.) 93 S. W. (2d) 1155.

It is true that the supreme court of Texas, in *Martin* v. *Railroad Com.*, 130 Tex. 153, 106 S. W. (2d) 653, held the act referred to in *Martin* v. *Railroad Com., supra,* to be unconstitutional, but it was on the ground that certain of its provisions were unreasonable and arbitrary, and it did not question that reasonable restrictions might have been imposed upon the business. We think it is a notorious fact that many evils have arisen because of the manner in which the business affected by chapter 50, *supra,* is carried on, which thoroughly justifies regulation, or even prohibition by the legislature if it so desires. As was said by the supreme court of Tennessee, in *Bowen* v. *Hannah*, 167 Tenn. 451, 71 S. W. (2d) 672, 674:

"The subject dealt with is illustrative of those new problems springing out of modern developments and conditions, to which it becomes necessary to apply age-old principles, as new demands arise. The flexible and comprehensive doctrine of the police power is justifiably invoked, as it may always be for the public safety and welfare in the protection of personal and property rights. Those occupations which are inherently subject to misuse, out of which may readily come oppression and fraud and crime, may not only be regulated, hedged about with safeguards, as a condition of their doing, but may be altogether prohibited, in the wisdom of the Legislature, in exercise of the police power. . . . The principle applied may well be extended to the case now before us. It is a matter of common knowledge

that danger to life and limb and property is attendant upon the practice of conveying unknown and unvouched for persons, or being conveyed by them, in automobiles over the highways. This is especially true when the distances are considerable, through long stretches of sparsely settled districts. Prudent drivers no longer follow the practice of yielding to solicitations for transportation from strangers. And prudent travelers are wary of accepting invitations from strangers for such transportation. The opportunities afforded for holdups, robbery, kidnapping, and impositions of many kinds are unlimited, and illustrations of such happenings are common.

"Why then was it not only the privilege, but the duty of the Legislature to regulate most strictly the business of the intermediary who proposes to make a profit out of bringing together persons who seek to transport and be transported under such conditions? What is known as 'hitch hiking' is prohibited altogether by many ordinances and some statutes. These laws prohibit direct solicitation of such engagements, as conducive to danger to the parties affected and a public menace. If one desires to exercise the privilege of holding himself out to the public as a medium through whom negotiations may be had for such transportation, with its manifest elements of danger already indicated, why should he not be required, first, to make a satisfactory showing of character and responsibility, and, second, to guarantee by indemnity bond that the carriers for whom he contracts will perform in good faith and with reasonable care? The effect is only to limit his dealings in this hazardous enterprise to those for whose integrity he can vouch, and of whose responsibility against recklessness he is sufficiently assured, by indemnity insurance, or otherwise. In view of the nature of the occupation he has chosen, wide discretion is vested in the Legislature to determine the extent and character of the restrictions proper to be applied."

We think the reasoning in the case last cited is unanswerable as to the right of the legislature to regulate the business of motor carrier transportation agents, or

even to prohibit such business entirely if the regulations imposed cannot remedy the evils.

But, it is urged, admitting the legislature may regulate the business, or even prohibit it, if it decides to regulate instead of prohibiting, these regulations must be reasonable and calculated to effect the purpose of the act, and it is claimed that in chapter 50, *supra,* they are unreasonable in that (a) the license fee required is exorbitant, (b) the bond is excessive, (c) its condition is not set forth in the statute, (d) the commission is given arbitrary power to reject an application for license solely on the ground that the applicant "is found, after hearing, to be unfit to properly perform the services proposed", and (e) that the acts which give rise to an action for breach of the bond are so indefinite and uncertain that it will be impossible for any agent to secure such a bond.

■ So far as the amount of the license fee required is concerned, we think that since the act is regulatory in its nature, and not a revenue measure, and there is nothing to show that the fee is greater than reasonably required to enforce the act, we cannot say it is so exorbitant as to render the act unconstitutional.

■ The bond fixed is somewhat large, being ten thousand dollars, but the damages which may accrue to one injured by the failure of the motor carrier transportation agent to live up to its conditions may be so great that we cannot say, as a matter of law, it is excessive.

■ The condition of the bond is "the faithful performance of any undertaking as a motor carrier transportation agent". The duties of an agent, for the breach of which he may be sued by the person injured thereby, are found in section 6 of the act and are set forth above in this opinion. All of these duties are fixed, definite and reasonable, with the exception of the one which says the agent shall not offer trans-

portation by any carrier "which is conducting its business in a manner contrary to public interest". This regulation is so vague and indefinite that we think it is arbitrary and unreasonable, because it offers no certain basis upon which the agent can determine in advance whether a carrier for whom he is negotiating transportation falls within the limitation or not. But since section 13 states that if any portions of the act be declared invalid, it shall not affect other parts which can be given proper effect, and since the provision last quoted can, and should, be deleted without affecting the remainder of the act, it leaves the duties of the agent fixed, definite and certain, and such as he can with reasonable diligence perform.

We think the legislature has the power to place some discretion in the licensing officer, for it is not to be presumed that he will reject an applicant for any arbitrary reason. If his action in any particular case should be arbitrary or unreasonable, the applicant has his remedy. *Gundling* v. *Chicago,* 177 U. S. 183, 20 Sup. Ct. 633, 44 L. Ed. 725.

Nor is the question of what constitutes a breach of the bond uncertain. Recovery may be had thereon only if the agent fails to perform the duties imposed upon him by section 6, *supra.* Nor does the act attempt to deprive citizens of their property without due process of law, as contended by plaintiffs. No tax is imposed upon property, but merely an excise tax upon the doing of a certain business, and it cannot be collected by a levy on property. The penalty for a violation of the law is personal, and not one affecting the property of the violator.

It is also contended the act is in conflict with the power given the federal government to regulate interstate commerce. Upon an examination of the chapter, it will be seen that it does not affect nor at-

tempt to affect directly any person operating a motor vehicle in either intra or interstate commerce. It does not attempt to make common carriers out of any private carriers, nor does it attempt to regulate or prohibit their engaging in the business of transporting passengers between Arizona and other states. Its operation is upon the agent, and not upon the carrier. If it affects interstate commerce at all, it is merely in an incidental and remote manner, and not directly. As was said in the case of *Pittsburg & S. Coal Co.* v. *Louisiana,* 156 U. S. 590, 15 Sup. Ct. 459, 463, 39 L. Ed. 544, quoting from *Sherlock* v. *Alling,* 93 U. S. 99, 23 L. Ed. 819:

" 'Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it within the meaning of the constitution. . . . And it may be said, generally, that legislation of a state, not directed against commerce or any of its regulations, but relating to the rights, duties, and liabilities of citizens, and only indirectly and remotely affecting the operations of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water, or engaged in commerce, foreign or interstate, or in any other pursuit.' "

The same rule is laid down in *Sligh* v. *Kirkwood,* 237 U. S. 52, 35 Sup. Ct. 501, 59 L. Ed. 835; *Territory of New Mexico ex rel. E. J. McLean & Co.* v. *Denver etc. R. Co.,* 203 U. S. 38, 27 Sup. Ct. 1, 51 L. Ed. 78. Indeed, in recent cases the Supreme Court of the United States has upheld many state laws which directly affect the interstate commerce carrier itself. *Bradley* v. *Public Utilities Com.,* 289 U. S. 92, 53 Sup. Ct. 577, 77 L. Ed. 1053, 85 A. L. R. 1131; *Continental Baking Co.* v. *Woodring,* 286 U. S. 352, 52 Sup. Ct. 595, 76 L. Ed. 1155, 81 A. L. R. 1402. We are of the opinion that the act in question in no manner violates the interstate commerce clause of the federal Constitution.

The whole purpose of the act is to place motor carrier transportation agents under bond to refrain from false advertising and false representations, or from the arranging for transportation with carriers who are violating the law. Certainly, this is within the power of the legislature, and the method of regulation, unless clearly arbitrary and unreasonable, is in the legislative discretion.

We hold, therefore, that chapter 50, *supra,* is constitutional in all respects, except as indicated. If this be true, plaintiffs are not entitled to an injunction preventing its enforcement by officials of the state. *Corbin* v. *Rodgers,* 53 Ariz. 35, 85 Pac. (2d) 59; *Engle* v. *State,* 53 Ariz. 458, 90 Pac. (2d) 988.

Nor do we think that a declaratory judgment is necessary. All that is required of plaintiffs is that they obey the terms of the act, and it appears they are not ambiguous in any manner.

The judgment of the superior court of Maricopa county is affirmed.

ROSS, C. J., and McALISTER, J., concur.