EX PARTE E. R. TALKINGTON.

No. 18852.   Delivered March 3, 1937.
State's Rehearing Denied April 28, 1937.

362

The opinion states the case.

*Yelderman & Yelderman,* of Austin, for appellant.

*William McCraw,* Attorney General, *Curtis E. Hill,* Assistant Attorney General, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—This is an appeal from an order of the County Court at Law of Tarrant County remanding appellant.

On September 10, 1936, Hon. David McGee, Judge of the County Court at Law of Tarrant County, Texas, made his order and judgment remanding appellant to the custody of the sheriff of Tarrant County upon a habeas corpus hearing, wherein appellant set up that he was illegally restrained by virtue of a warrant of arrest based on a complaint and information, which seems to have been filed May 25, 1936, charging appellant with operating as a motor transportation agent in violation of the terms of Senate Bill 265, enacted by the 44th Legislature at its Regular Session in 1935. See Chapter 325 said Acts.

The statement of facts herein shows that appellant conducted what is generally known as a travel bureau in Fort Worth, Texas, at the Metropolitan Hotel in said city. Here he kept two registers. In one persons registered their names and addresses who desired to share the expense of travel with some person owning an automobile and going to the point to which the registrant desired to go. In the other, persons registered as going by automobile to points within and without the State of Texas, who would like to have some person accompany them and pay part of the necessary expense of the trip. Further it is shown by the record that if appellant brought two persons together whose names appeared on the respective registers mentioned, and these parties agreed with each other upon the division of the expense of the trip under consideration,—the party who rode in the car of the other paid to appellant one dollar as compensation for his said service.

Appellant collected nothing from the car owner, had nothing to do with the share-expense agreement, got no part of the

cost of same, made no representations, and gave no guarantee in regard to cars, or the conduct of the trip,—acting solely as an information bureau or person who collected from one of said parties the fee above set out in case his information brought such parties together, and they made a satisfactory agreement between themselves.

Particularly, it is set out that on May 25, 1936, appellant was holding himself out to operate as above stated, and that he was not the agent or representative of any common carrier, nor connected in any way with the operation of any school bus, or with the operation of a motor vehicle operating solely within a municipality. Further it is set out that on said day one Daikin being in Fort Worth and desirous of going to Beaumont, registered with appellant as so desiring; that on the same day one Kate Schroeder, owner of an automobile, being in ·Fort Worth, registered with appellant as willing to take with her in her car to Beaumont a person who would be willing to pay a part of the expense of the trip. Later, in appellant's office, said parties met and came to a satisfactory agreement between themselves as to the respective shares of the expense ·of the trip to Beaumont, after completing which arrangements Daikin paid appellant one dollar for his said service. Miss Schroeder did not have a license or permit issued by the Railroad Commission of Texas to transport persons for hire over the highways of Texas, and while she and said Daikin were on their way to Beaumont, and were at Waxahachie, Texas, it is made to appear that she was arrested for an alleged violation of the "Motor Transportation Act." It is further stated that Miss Schroeder was a resident of Kansas, and on said date was enroute from her said home to Beaumont, Texas. It is further made to appear that appellant at said time had no license or permit from the Railroad Commission of Texas to operate as a transportation agent as defined in the enactment above referred to, and that he had never had such license.

This court sees no substantial difference in the facts here exhibited and those brought before us in Ex Parte Martin, 127 Texas Crim. Rep., 25, 74 S. W. (2d) 1017, and observe that the contentions relied upon by appellant here are much the same as appeared in said cause. While it is true that the verbiage of the law as it was when the opinion in the Martin case was handed down has been changed to some extent, it is asserted that all the vices and defects of the former law are retained and others added.

Section 1 of the present act names all persons engaged as

is appellant "transportation agents." Section 2 exempts the operators of motor vehicles designated "common carriers," school buses, and motor vehicles operated solely within a municipality. Section 3 authorizes the Railroad Commission of Texas to license and supervise motor transportation agents "In all matters affecting the regulations between such motor transportation agents, their customers, and the public." Section 4 makes it unlawful for one to act as a motor transportation agent without having first gotten a license from the Railroad Commission, and complied with all the requirements of this act. Section 5 gives sixty days after the passage of the act to persons then engaged in said business to apply for licenses; requiring them to accompany their applications for same in writing, by payment of fifty dollars, and provides that all wishing to engage in said business, after the passage of the act, shall make application and procure same before engaging in such business, and it is provided that they must send with their application fifty dollars, upon receipt of which the Railroad Commission shall set a date for a hearing, and give at least ten days notice to the officers or owners of any common carriers of passengers operating in the territory in which applicant proposes to operate, and to any other person who, in the opinion of the Commission, may be properly interested in such application; and such common carriers of passengers or other persons are expressly declared to be interested parties, and are given the right to appear and offer testimony for or against the issuance of such license.

The second paragraph of said Section 5 is here quoted because later in this opinion we may have occasion to discuss more in detail its provisions:

"In determining whether such license, referred to in the preceding paragraph, shall be issued, the Commission shall give reasonable consideration to the financial responsibility and character of the applicant and the nature and safety of the actual agencies of transportation employed or customarily procured by applicant; the financial responsibility and character of the owners of such agencies of transportation; the nature of highways over which such agencies of transportation are procured shall be employed and the effect thereon and upon the traveling public using such highways; and the effect such transportation may have upon other transportation service being rendered; and all other pertinent facts. If, upon hearing, the Commission shall determine that the applicant is a fit and proper person to act as motor transportation agent,

and that any motor carriers through which the applicant proposes to sell or arrange transportation have complied and are then and there complying with all rules and with all proper rules and regulations applicable to their respective cases, the license shall be issued. Providing, however, that before such license shall be issued, the applicant for license."

Following the part just quoted appear certain provisos, the first of which is as follows:

(1) "Shall deliver to the Commission and maintain continuously in force and effect a bond in the sum of One Thousand ($1,000.00) Dollars, executed by the applicant, as principal, and as surety by a bonding or insurance company satisfactory to the Commission and authorized to do business in this State, in such form as the Commission may prescribe, for the protection, use and benefit of any person or persons who shall suffer loss or damage by reason of the failure of any person or motor carrier, through whom transportation may be arranged or over which tickets may be sold by the applicant, to properly fulfill any contract or agreement for such transportation which may have been partially or wholly negotiated by the applicant." It will be observed that in the first above quoted part of this Act the person who may register as desirous of getting some one to accompany him or her on a share-expense trip in the car of such person, is called a motor carrier. In the second proviso to paragraph five of this act we find the following:

(2) "In the event transportation is contracted through the influence, efforts, activities, information or direction of the said transportation agent, the contracting carrier shall have on file with the Railroad Commission of Texas adequate bonds and/or insurance policies; and the transportation agent contracting, influencing, giving information, or direction to the contracting carrier agent to prospective passengers, shall request of the contracting carrier or carriers to exhibit to the said transportation agent a certificate from the Railroad Commission of Texas certifying that such contracting carrier or carriers has on file in the Railroad Commission office adequate bonds and insurance policies, and it shall be the duty of the contracting carrier or carriers to exhibit to such transportation agent such certificate before any attempt is made to transport any person or persons intending to be transported by such contracting carrier or carriers, and it is further provided, that in any instance the transportation agent permits any person or persons or permits the contracting carrier to transport any person or persons who has not filed with the Railroad

Commission of Texas a public liability bond, or insurance policy, such transportation agent shall be guilty of a misdemeanor and, upon conviction, shall be fined not less than One Hundred ($100.00) Dollars and not more than Five Hundred ($500.00) Dollars. The amount of such policy or policies of insurance shall be fixed by the Commission by general order or otherwise, and the terms and conditions of said policy or policies covering such motor vehicles are to be such as to indemnify the applicant against loss by reason of any personal injury to any person or loss or damage to the property of any person other than the assured and his employees. Such policy or policies shall furthermore provide that the insurer will pay all judgments which may be recovered against the insured motor bus company based on claims for loss or damage from personal injury or loss of, or injury to, property occurring during the term of said policy or policies and arising out of the actual operation of such motor car, and such policy or policies shall also provide for successive recoveries to the complete exhaustion of the face amount thereof, and that such judgments will be paid by the insurer irrespective of the solvency or insolvency of the insured. Such liability and property damage insurance as required by the Commission shall be continuously maintained in force on each and every motor propelled vehicle while being operated in such service."

It is also provided in subdivision (a) of Section 6 of the Act that the license fee of fifty dollars required of appellant is to go into the Motor Carrier Fund to be used in the enforcement of this act; and it is further provided that if license be denied, the fifty dollars deposited as license fee shall remain in said fund. Subdivision (b) of said Section 6 provides for a further tax on twenty-five dollars per year, in addition to all other fees, and requires that the license of the applicant shall be conspicuously displayed in his office, and that he cannot do business anywhere except in said office, whose location shall be described in the license; and before appellant can move to a new location he shall give notice in writing of his intention to move, and describe therein his new location so the Commission can issue license for the new place.

Section 7 provides that the Railroad Commission may under given circumstances revoke said license if it be found out that the holder is not a fit person, or has violated the law of the land, or the rules of the Railroad Commission, or has sold, offered for sale, or negotiated for sale, wholly or partially,

transportation by any carrier that has violated, or is not complying with the laws of this State, etc.

Section 8 of the act requires that the transportation agent shall keep for a period of one year an exact and permanent record of all transactions had by him, including the name and address of the person or persons transported, the amount paid the agent, the point of destination, the name of the person, firm or corporation acting as carrier, and the name and address of the insurance company carrying liability insurance for such carrier. It is then provided how the act shall be enforced, and a penal provision is made for punishment by fine and imprisonment for violation of such provisions, and each day is made a separate offense.

Bearing in mind what we have above set out from the statement of facts showing the business of appellant to be confined to selling information; and that he does not sell or negotiate transportation, nor own nor operate any motor vehicle over any highway in this State or elsewhere, and does not dictate or suggest the terms or conditions upon which the purchasers from him of information shall contract with each other, or whether they go by dirt road or paved, or what route they take,—this law seems clearly in violation of the Fourteenth Amendment to our Federal Constitution, and of Section 19 of our own Bill of Rights, in that it prohibits this man or any other engaging in a like occupation, upon the same terms and conditions, because of requirements unreasonable, impossible of performance, without fair application, and prohibitive, and surrounds his attempt to engage in this business with conditions precedent and concomitant such as reveal themselves to a casual reader of those parts of the statute which we have above quoted as being of the kind and character we have just stated.

When did the officers and owners of common carriers of passengers for hire become vitally interested in who might bring into contact with each other a lady from Kansas through Fort Worth to Beaumont, and a man in Fort Worth, both of whom were willing to share the expense of the trip as occupants of the lady's car, upon terms and conditions mutually acceptable. What right would any governmental agency, court, commission or legislature have to say that such a lady could not take in her car from Fort Worth to Beaumont any person acceptable to her upon any condition which she saw fit to impose, as far as pay was concerned. None whatever!

Yet this act undertakes to surround her with conditions and

requirements with which she could not reasonably comply, and in addition to exacting from her bonds and insurance policies wholly unreasonable,—seeks also to compel this applicant as a condition precedent to his bringing such persons in contact with each other, to execute bonds and have insurance to guarantee against losses and damage for which he could in no court or forum be held liable.

It would be foolish to expect any solvent citizen, corporation, or insurance company to bond a man whose sole connection and duty is finished, under the facts before us, when by means of his information bureau he brings together a man who wants to go with some other on a given trip, and another who has a vehicle in which he purposes to make such a trip,—such bond or policy being (according to the statute) to protect "Any person or persons who shall suffer loss or damage by reason of the failure of any person or motor carrier, through whom transportation may be arranged or over which tickets may be sold by the *applicant*," meaning thereby the person who had brought the parties together, who, under the facts of this case, sold no tickets, arranged no transportation, and was in no legal sense the representative of the individual furnishing transportation, who is here called "Motor Carrier."

Any respectable bonding company, solvent bondsman or insurance company applied to to make such bond, would presumably ask the information agent "How can we afford to bond you when you do not own the vehicle and not going on the trip, and have no connection with the matter save to make this contact?" In connection with a possible answer to the above question, our attention is attracted by another condition set out in our quotation above, which may have been intended as an answer to just such query.

In the terms of the case before us, the information agent could not legally bring the lady and gentleman in contact, and let them contract with each other, and collect from the man his one dollar fee,—without informing the lady of, and seeing that she had complied with,—another part of this act which seeks to require her, if she would take advantage of a contact brought about through appellant, to have on file with the Railroad Commission of Texas, before she entered into any contract with her passenger,—adequate bonds or insurance policies, and be in possession of a certificate of such fact; the terms and conditions of which bonds are almost unbelievable. See the quoted part of Section 5 of this act, supra. We call special attention to the following part of said quotation:

"Such policy or policies shall furthermore provide that the insurer will pay all judgments which may be recovered against the insured motor bus company based on claims for loss or damage from personal injury or loss of, or injury to, property occurring during the term of said policy or policies and arising out of the actual operation of such motor car."

It seems plain that such provision is wholly arbitrary, unreasonable, wrong and against our Constitution. Miss Schroeder lived in Kansas, and as far as this record reveals had never been in Texas. If she had come to Fort Worth, and there made contact through a friend, or by means of an advertisement or accidental meeting, etc., etc., with a person going to Beaumont, and they had agreed to go together in Miss Schroeder's car, upon a share-expense basis, it would not be contended for a moment that a Railroad Commission agent could interfere or legally object, or have any right to arrest Miss Schroeder, for it is certain that such conduct could violate no law of this State.

Under this statute if good, Miss Schroeder could make contact with any other person in Fort Worth, make satisfactory arrangements and go happily on her way to Beaumont,—without having to make bond to indemnify any bus company or other person, but if she met appellant, who was in the business of furnishing such information, he would have to tell her that she could not contract with any person through him unless she had made application for and been granted bond by the Railroad Commission of Texas, had made such bond, and that fact had been certified to by the Commission.

We have seen no clearer case of abridgement of the rights and privileges of the citizens of this State and of the United States, and the invasion of the liberties of a citizen to engage in and pursue a lawful business than appears in this record. We call special attention to the authorities cited in Ex parte Martin, supra, and the reasoning indulged.

We are not unmindful of a decision of our Court of Civil Appeals at Austin, in the case of Martin et al. v. Railroad Commission, opinion April 1, 1936, which may have been and probably was based on certain findings of fact by the trial court from which the appeal was taken, which findings are wholly at variance with the facts here, and could hardly have application to facts at all similar to those in this case.

Our attention is also called to the case of Bowen v. Hannah, 71 S. W. (2d) 672, by the Supreme Court of Tennessee. There a suit was brought under a special statute of Tennessee to test

370

the constitutionality of an act in some respects like the one here involved. There was a demurrer to the petition in the court aquo, which was overruled, and the State officials appealed. There appear no facts in the opinion in that case by which we may make comparison; nor is the statute there involved set out at length, but enough of it appears to make apparent the proposition that both the law and facts are different. In the beginning of the opinion it is stated that no charge of discrimination was presented. Nor are we informed by the opinion what is the definition given by the Tennessee law to the term "Motor Transportation Agent." Their law appears to have had for its object the licensing and supervision of motor transportation agents and motor freight brokers.

However, we find ourselves unable to agree with our sister court in some of its conclusions. We see no parity between the law applicable to the business of pawn brokers, or dealers in second-hand automobiles, or junk dealers, and the law here under discussion. Nor are we quite able to follow the argument that because men have picked up and carried hitch hikers who have turned out to be robbers, that this furnishes any reason to regard as dangerous or to hold bad a law against a business which merely brings parties together, who on their own responsibility, and with no limitations upon their investigation and inquiry, if desired, may eventually enter open-eyed into an agreement to make a trip together.

It seems to the writer, with deference to the learned judge who wrote in the Bowen case, that such arguments weaken the soundness of his conclusions that because of such things,— the Legislature might within the Constitution legislate against and even prohibit the occupation under discussion. Apparently following such reasoning that court almost lightly sets aside the undeniable fact that the bond requirements, etc., are impossible of compliance, and that therefore such provisions deny to applicant property rights; the court holding that since the Legislature might prohibit directly such occupation, they might enact prohibitive restrictions. This reasoning follows and is based on what appears an entire fallacy, viz.: that the occupation under discussion is inherently wrong and dangerous to the property rights of the people, and, therefore, is within the police power of the Legislature.

We see nothing in the case before us to support any such conclusion. No effort was made to bring forward testimony from which such inference could arise. We have no right in

and of our own beliefs to engraft upon court records conclusions not legitimately supported by what we find in the record.

Without attempting to call attention to all the unreasonable parts of this Act which appear on its face, but being of opinion that the lower court was in error in remanding this appellant, and that the law herein involved is violative of both State and Federal Constitution, as above set out, the judgment of the court below will be reversed and the release of the appellant ordered.

*Reversed and appellant's release ordered.*

### ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—After an earnest consideration of the State's motion for rehearing we have not been convinced that we reached a wrong conclusion in our original opinion. To write further on the subject would be only a multiplication of words.

The motion for rehearing is overruled.

*Overruled.*