GARLAND v. BROWN, Adm'r of O. P. A., et al.

BROWN, Adm'r of O. P. A. v. GARLAND.

Civil Actions Nos. 907, 908.

District Court, N. D. Texas, Dallas Division.

Oct. 29, 1943.

402

Jack C. Burroughs, of Dallas, Tex., for Lee Garland both as plaintiff and as defendant.

W. J. Holt and W. A. Griffis, Jr., both of Dallas, Tex., for Prentiss M. Brown, as plaintiff, and for Prentiss M. Brown, et al., as defendants.

ATWELL, District Judge.

On October 1, 1943, at 2:25 P. M., No. 907 was filed. On the same day, at 3:15 P. M., No. 908 was filed. Each prayed that the other be restrained from engaging in practices which were detailed.

A show cause order was issued upon each, returnable on October 25th. On that date the causes were consolidated under No. 907; Garland continuing as plaintiff and O. P. A. employees, and defendant Brown cross-actioned and the cases were tried as one.

The testimony shows that Garland had two places of business in Dallas. Each of the places was a downtown office where a citizen who contemplated making an automobile trip out of Dallas could get in touch with another citizen, or, citizens, who might be going in that same direction, and, after having gotten together, they could agree upon the terms for such transportation. Garland charged a fee for arranging this meeting.

In his place of business could also be ascertained the approximate charge that might be made for such transportation. Whether such amount was finally agreed upon by passenger and the driver was wholly their affair. Garland did not engage in such fixing. He made no representations as to route, sort of car, time of journey, nor did he offer any sort of guarantee.

He charges that his business was lucrative and properly conducted. That in the summer of 1943, after he had brought a suit against defendant Holt, who is one of the attorneys for the O. P. A., for stating that his, Garland's, business was illegal, that a number of investigators of the O. P. A. interfered with his business by spying upon, challenging, and otherwise engaging in espionage of the drivers of such automobiles and that as a result thereof his business has been seriously damaged.

The O. P. A. officials contend that Garland's places were rendezvous for regular drivers who frequently violated the national Rationing Regulations applying to both tires and gasoline. That such illicit traffic and trade justified their activities.

The testimony sustains the contention of each in some respects. Certain of the O. P. A. officials conceived the idea that a Travel Bureau was illegal. The filing of the suit against one of its regional attorneys and the refusal of Garland to comply with a subsequent request of that attorney that his business be conducted in a certain way, precipitated the constant maintenance of quite a number of O. P. A. investigators in and about his place of business, who, in some instances, made the assertion that his business was illegal. In many instances they demanded the right to inspect the ration credentials of the drivers and frequently kept the same. On the other hand, there is credible testimony tending to show that many of those who were driving were not casual drivers or citizens bounden on pleasure or business trips and desiring to share the car and thereby accommodate or thereby make a profit. Some of them were possessed of ration coupons to which they were not entitled. Some of them dealt in such coupons and some of them had secured illegal tire certificates.

The testimony is not convincing that Garland knew about these illegalities. But it is convincing that he did know that some of them were regularly engaged in the business of such transportation, and there is testimony to the effect that he, himself,

talked about and exhibited a number of ration books in his place of business.

The plaintiff names Brown, the Administrator of the O. P. A.; Harrell, a regional attorney; McCullouch, his agents, servants and employees; Dick Holt, a regional attorney; W. A. Griffis, Jr., a regional attorney; and investigators Bryant, Payne, Norvell, Holbert, McCauley, and Beasley. He alleges that these defendants "made a practice and threatened to continue such practice, of stopping every automobile or driver who parks his automobile on the plaintiff's parking lot, or who parks the automobile in front of or near the plaintiff's offices, and stopped said prospective carriers of share-expense passengers, and asks of them, where are you going, (and after getting the information and that he would carry some soldiers or anyone who might travel around with him), whereupon said defendants would demand of such prospective carrier to see his ration book, and regardless of the kind, they would tell the said carrier that he had no right to carry passengers for hire, or, on a share-expense basis, and if he did so, the book would be taken away from him; that they would threaten the carrier with arrest; that they took the books without any cause whatsoever; and placed the carrier under technical arrest and took him to the city jail and threatened him with violence, unless he signed statements containing false statements; that the business of plaintiff is unlawful and illegal and if the carrier does business with him he is liable to be arrested and filed upon in the federal court." Also, "That the defendants openly and maliciously threatened to put plaintiff out of business." That he has no adequate remedy at law and that his business will be destroyed.

He prays that the defendants and each of them be restrained from continuing such acts.

Brown, the plaintiff in No. 908, and the plaintiff in the cross-action in No. 907, pleads the O. P. A. regulations and sets out the names of eight persons whom he alleges were misusing gasoline and tire regulations and operating passenger vehicles for hire to and from Garland's travel bureaus. That they were well known to Garland. That some of the illegal transactions with reference to tires and ration books occurred "on and about the plaintiff's travel bureaus." That the ration books "are the property of the Gov-

ernment and are subject to inspection by any officer, state or national, or by the investigators of the O. P. A." That while some of the investigators were making such inspection, that Garland appeared and told the citizen that he "did not have to tell the investigator a thing." That Garland has "on numerous occasions failed and refused to cooperate with the investigators," and "has used divers and sundry means to aid and abet in the violations of the mentioned ration orders, * * * in assisting various and sundry drivers of passenger automobiles operating from his places of business, in the misuse of ration books, both as to tires and gasoline." He prays, "and demands" restraining order against Garland "and all persons in active consort and participation with him, from directly, or indirectly, violating the terms and provisions of ration orders * * *, and from offering, attempting, soliciting, or agreeing to do any of the foregoing."

The pleading of each is a rather new example in that field.

It is easily seen that each plaintiff is moving in the great field of equity. Each is appealing to the conscience of the chancellor for protection. Each must, therefore, enter the temple with clean hands. Misconduct which falls within the maxim must relate to the transaction concerning which complaint is made; or, to the subject matter in litigation. It must have been injected into the cause so that to entertain it would be violative of conscience. The resultant of the maxim is, that a court of equity will leave the guilty parties who seek its aid where it finds them. It is not destroyed by legislation which enlarges jurisdiction.

If we make an application of that helpful and healthy maxim in this case, we find that Mr. Holt charged that Garland's business was illegal. That, as a result of that charge, Garland sued him. Thereafter, Holt wrote a letter to him endeavoring to get him to run his business according to Holt's idea. This, Garland refused to do. Then investigators under Holt's bureau, appeared in considerable numbers around Garland's business, interrupting that business and otherwise inquiring into and making it unpleasant for those who would deal with him. This nettled Garland, and upon two occasions he appeared and told the customer that he need not pay

any attention to what the investigator demanded.

That statement by Garland is made one of the bases of the suit and cross-action by Brown.

As to Garland, his dealing with some drivers who were later discovered to be securing gasoline and a few tires by illegal stamps and certificates, merited proper investigation by the investigators of the O. P. A. charged with such duties. And this, even though he did not know of such illegalities, nor participate therein.

Therefore, the very acts of which each complain, were, to some extent, the reason for the activity of the other.

█ It was certainly wrong of Holt and his investigators, to declare that Travel Bureaus were illegal; that they were going to put them out of business. Neither Holt nor Brown, nor the investigators had any such power. Nor are Travel Bureaus illegal in Texas. Power is voracious. It has an increasing appetite. It grows upon its own exercise. There is nothing in the national rationing regulation, or statute, which authorizes the "putting out of business" the Travel Bureau. The highest court of Texas, which deals with such matters, has declared upon a number of occasions that the business is legitimate and any attempt to eliminate it by regulation is unconstitutional. Ex parte Martin, 187 Tex.Cr.R. 25, 74 S.W. 2d 1017; Ex parte Talkington, 132 Tex. Cr.R. 361, 104 S.W.2d 495. A business may not be declared contraband which merely brings parties together who on their own responsibility, and with no limitation upon their investigation and inquiry, may eventually enter into an agreement to make a trip together. So the debate is over on that question. The Travel Bureau is legal in Texas.

When attorney and defendant Holt was cross-examining Garland on the stand, the heat of each was quickly discoverable.

█ Of equal righteousness was the attempt of the investigators to examine gasoline ration books of drivers' automobiles. That right is given in a regulation, issued under the Act, and in pursuance of its authority and provisions on July 2, 1943. It is Sec. 1394.8227 as an amendment to Ration Order 5 C. It is rather long, but among other things provides that upon de-

mand by any investigator of the O. P. A., or of any police officer, or other law enforcement officer of the United States, or of any state, or local government, every person shall produce for inspection any tire record or gasoline certificate and ration book, whether valid, invalid, void, or expired. And such officers are authorized to make inquiries of such person to determine whether there is a violation of Ration Order 5 C, and they "are authorized to receive the surrender of all gasoline deposit certificates, gasoline coupon books * * *."

It will be noticed there is no authority to take away such books or records from the citizen. The officer is merely authorized to receive the "surrender." There is also a correlative regulation in another department which provides for the hearing, upon notice, of such citizen before the local Ration Board, and the return of such property if the Board concludes that it should be returned.

There is no authority to arrest. There is no authority to take. The statement on the part of such investigator to the citizen, that the citizen accompany him to the police station, or, that an officer make an arrest, is, in short and in substance, a procedure which is unlawful by the investigator.

There is nothing however in the regulation which authorizes the investigator to so multiply himself in numbers and to so exhibit his power as to intimidate the citizen who is a potential customer of another citizen.

But this authority of the investigator justified some acts in the direction in which it was taken. Thus, Garland, by his own activities, invited, to a legal extent, what was done.

To deny the investigators the right to act within their legal limits, would be wrong and harmful to the lawful enforcement of a very useful statute which prevents the waste of an article which is imperatively necessary in the prosecution of the war, and for the prevention of which waste the statutes and regulations were passed.

To restrain Garland in his right to carry on his legal business would be extremely high-handed and unjustified and a violation of his right as an American citizen to be secure in both person and property, as well as in vocation.

█ Considering the surcharged atmosphere surrounding these parties and growing out of their determined ideas of their respective rights, it would be wrong to leave them without some guiding restraint, regardless of their responsibility for the creation of the present situation as above detailed.

It must be remembered that on week-ends, thousands of solidiers congregate in the city of Dallas, from camps northeast, northwest, west and south of the city. That such soldiers find the regular train and bus accommodations insufficient to get them back to their camps. They flock by the hundreds to the Travel Bureaus. Many citizens go there for the purpose of assisting them, and also for the purpose of making a pittance for themselves. There is nothing wrong about that. It must be indulged.

█ So orders may be drawn enjoining defendant Holt and the named investigators and employees acting under or with him, or his department, from proclaiming the illegality of Garland's business to potential customers, or, to the public. Further, from unreasonable inquiries and espionage and statements around Garland's places of business.

█ The order will also restrain Garland from knowingly dealing with any driver, either regular or casual, who uses rations or certificates for gasoline, or tires, illegally secured, and, from interfering with such orderly and reasonable investigation of drivers with whom he deals, by investigators of the O. P. A.

All other relief than that specifically and definitely granted herein to each party, is denied.