**HOUSTON OILERS, INC., Appellant,**

v.

**Ralph NEELY, Appellee.**

No. 8520.

United States Court of Appeals
Tenth Circuit.

May 18, 1966.

Rehearing Denied June 23, 1966.

William R. Eckhardt, of Vinson, Elkins, Weems & Searls, Houston, Tex., and Gus Rinehart, of Rinehart & Morrison, Oklahoma City, Okl., for appellant.

James D. Fellers, of Fellers, Snider, Baggett & McLane, Oklahoma City, Okl., and Thomas J. Moroney, Jr., of Wynne, Jaffe & Tinsley, Dallas, Tex. (Angus G. Wynne, Dallas, Tex., and J. Howard Edmondson, Oklahoma City, Okl., with them on the brief), for appellee.

Before PICKETT, HILL and SETH, Circuit Judges.

PICKETT, Circuit Judge.

This appeal concerns the validity of a professional football contract signed by

Ralph Neely, a University of Oklahoma football player, and Houston Oilers, Inc., a Texas corporation which owns and operates a professional football team in the American Football League. Neely, a high school athlete of great promise, graduated from the Farmington, New Mexico high school in 1961, and found his way to the University of Oklahoma at Norman, Oklahoma. There his proficiency in football continued to develop, and in his senior year he became one of the nation's outstanding collegiate football players. He intended to play professional football and desired to take full advantage of the financial benefits arising from the rapidly growing popularity of professional football and the rivalry existing between the two major professional football leagues. Upon completion of the regular football schedule at the University of Oklahoma on November 28, 1964, the right to contract for Neely's services was awarded under a draft process to the Houston Oilers in the American Football League and to the Baltimore Colts in the National Football League.[1] On December 1, 1964, Neely signed American Football League Standard Players Contracts with Houston, each containing a "no-cut" clause, for the seasons 1965 through 1968, and received therefor a $25,000 bonus check. Thereafter Neely signed contracts with the Dallas Cowboys of the National Football League, which had acquired Baltimore's draft rights to Neely, and returned the Houston contracts and the $25,000 bonus check.

Houston thereupon brought this action for a judgment, declaring its contract with Neely to be valid and enforceable, and for an injunction restraining him from playing professional football with any team other than Houston. The trial court, in denying the relief sought, found that the contract was tainted with fraud and violative of the Texas Statute of Frauds. We hold that the undisputed facts in the record disclose a valid and enforceable contract.

Immediately after the draft on November 28, 1964, both Baltimore and Houston had set in motion their contract machinery to acquire the services of Neely. On that date Neely, while enroute to New York City to accept honors awarded him as an All-American choice and to participate in the Ed Sullivan television show, discussed his plans with representatives of the Baltimore team and was given a firm offer to sign a contract. On the same day, Breen, the personnel director of the Houston team, went to New York for the sole purpose of obtaining a commitment from Neely. Neely was accompanied by his father-in-law, Robert Forte, an Oklahoma City businessman, who participated in all the negotiations as advisor to Neely. In New York City, Neely advised Breen of the Baltimore offer,[2] but indicated that he preferred to play in the southwest. Neely told Breen that in any contract negotiations he wanted to discuss an arrangement for off-season work. Breen assured Neely and Forte that such an arrangement could be worked out, but only K. S. Adams, Jr., President of the Houston Club, could discuss such proposals. For the purpose of continuing contract discussions, the three traveled to Houston, arriving there on November 30th. At a meeting attended by Neely, Forte, Adams and Martin, the club's General Manager, a four-year contract with a "no-cut" clause was offered to Neely. The offer provided for a $25,000 bonus and a salary of $16,000 per year. In addition, Adams agreed to secure employment for Neely with a local real estate firm at a guaranteed annual income of not less than $5,000. Adams also agreed that an oil company which he owned and controlled would construct a "conventional Phillips '66 Service Station" on a suitable location in Harris

---

1. Under the rules of both leagues, a club which selects a player in the regular course of the draft owns the exclusive right to contract for the services of that player.

2. This offer was stated to be a $25,000 bonus and a four-year contract starting at $16,000 per year and escalating to $25,000 for the fourth year.

County, Texas, at an approximate cost of $30,000 to $60,000, and convey the same to Neely by special warranty deed, subject to the Phillips '66 lease and a deed of trust.

Neely was impressed with the offer but desired further time to consider it. On December 1, 1964, Adams was advised that the offer was accepted. In the meantime, Neely had conferred with his wife and the owner of the Baltimore Club. The Standard Players Contracts were then prepared and executed by the parties,[3] but were left undated. The letter agreement for additional employment, the filling station agreement, and the bonus check were dated December 1, 1964 and executed and delivered on that date. It is stipulated that these instruments constitute a single transaction. From the beginning of the discussions, Neely, for tax reasons, had insisted that the bonus money must be paid in 1964, and further, that the signing of the contract and the acceptance of the bonus money be kept secret to prevent him being declared ineligible to participate in the post-season Gator Bowl game on January 2, 1965, to which the University of Oklahoma had accepted an invitation. Any rational consideration of the evidence leads to the conclusion that all the parties knew that if Neely signed a professional football contract and received money therefor, under the rules of the N.C.A.A. and the Big Eight Conference, of which the University of Oklahoma was a member, he would consequently become ineligible to compete in the post-season game. Neely and Forte were advised that such a large sum of money could not be paid without a

signed contract. It was then agreed that when the contract was signed, the $25,000 bonus check would be made payable to Forte as Trustee and that all the contract transactions would remain confidential, with no public announcement until after the Gator Bowl game.

After the contracts were executed, copies were delivered to Neely, he and Forte returned to Oklahoma. Later that day Houston's General Manager inserted the date "December 1, 1964" on the Standard Players Contracts and thereafter copies were filed with the A.F.L. Commissioner. Neely testified that he understood the arrangement to mean that the contracts would not be effective or filed until after the post-season game. However the contracts provide in plain language that they shall be valid and binding immediately upon execution and that a copy shall be filed with the League Commissioner within ten days thereafter.[4] The A.F.L. rules also require the filing of all player contracts within 10 days after execution.

Immediately upon his return to Oklahoma, Neely was advised that the Dallas Cowboys, another team in the N.F.L., had obtained Baltimore's draft rights and desired contract discussions with him. Forte made several trips on behalf of Neely, and, unknown to Houston, Neely's contracts were forwarded to Dallas' attorneys for examination. Neely signed letters dated December 29, 1964, prepared by attorneys for Dallas, addressed to Houston and Adams, advising that he did not consider himself bound by the contracts and was withdrawing therefrom. The $25,000 bonus check was returned. These letters were received by

3. These player contracts are identical to those signed by all A.F.L. players and, in substance, are the same as those used in the N.F.L.

4. Each of the Players Contracts contain this provision:
"18. Upon its execution, this contract shall be valid and binding immediately upon the parties hereto. A copy of this contract shall be filed by the club with the Commissioner within ten (10) days after execution. Within ten (10) days after its filing in the League office, the Commissioner shall have the right to terminate this contract by his disapproval in accordance with and pursuant to the powers vested in him by the Constitution and the By-Laws of the League. If so terminated, the Commissioner shall promptly give both parties written notice of such termination and thereupon both parties shall be relieved of their respective rights and obligations hereunder."

Houston and Adams on December 31st. On that date the Dallas Club deposited $25,000 to the account of Neely in a Dallas bank. Prior to any publicity of the matter, Neely, apparently sensing trouble after the return of the Houston contracts, advised his coach in Jacksonville, Florida, where the Oklahoma team was preparing for the Gator Bowl game, of his activities in regard to the Houston contract. At about midnight on December 31st, Neely was notified that there had been some publicity concerning his signing with Houston. On January 1, 1965, Neely was advised that he had been declared ineligible to participate in the Gator Bowl game. There is no evidence from which it can be inferred that any publicity by Houston brought about this action. That evening Neely signed a contract to play with Dallas for the 1965 through 1968 seasons. He played for Dallas during the 1965 season and will continue to do so unless enjoined therefrom.

■ Neely was over the age of 21 years, and it is stipulated that he had "special, exceptional, unique knowledge, skill and ability as a football player." He was competent to enter into a valid contract to perform these services exclusively for a designated person or organization, and upon agreeing to so limit his services, he was subject under Texas law, which the parties agree is controlling, to be enjoined from performing them for anyone else.[5] Dallas Cowboys Football Club, Inc. v. Harris, Tex.Civ.App., 348 S.W.2d 37; Mission Independent School Dist. v. Diserens, 144 Tex. 107, 188 S.W. 2d 568.

■ Disagreement over the validity of these contracts does not arise out of the provisions contained therein, but from an extrinsic oral understanding that their existence was to be kept secret until after the post-season game. The essence of Neely's contentions before the trial court and here is that the contracts are unenforceable because Houston falsely represented that the effective date of the agreement would be January 2, 1965, and that Houston's filing of the contract copies with the Commissioner was a violation of its promise to keep the matter secret. The trial court was of the opinion that these alleged misrepresentations constituted fraud in the inducement of the contract which would subject it to rescission. As has been heretofore stated, each contract specifically provides otherwise. Neely does not say he was so naive that he did not know his eligibility for further inter-collegiate football competition would be destroyed when he signed a professional football contract and received the bonus money.[6] The record is too clear for any misunderstanding that the purpose of secrecy surrounding the execution of the contracts was not to preserve Neely's eligibility, but rather to prevent his ineligibility from becoming known; otherwise there was no need for secrecy. This is illustrated by his later dealings with Dallas which similarly were not publicized, although a $25,000 deposit was made to his credit on the 31st day of December, 1964, thereby permitting him to report that amount as income for the year 1964 in his income tax return. The acceptance of this money ended his eligibility.

■ The trial court's conclusion that Houston represented to Neely that he would remain eligible if the contracts were kept secret is not supported by the

5. The players contracts signed by Neely provide:

"5. The Player promises and agrees that during the term of this contract he will not play football or engage in activities related to football for any other person, firm, corporation or institution except with prior written consent of the Club and the Commissioner. * * *."

6. Neely testified: "Q. But you did know that if you took money for playing football that that would make you ineligible to play college football, didn't you? A. Took money, yes sir."

In regard to the acceptance of expense money for the trip to Houston, which is also a violation of inter-collegiate rules, he testified: "Q. Isn't it true, Ralph, that you well knew that any time your expenses were paid by a professional football team, that made you ineligible to play football? A. I suspected it, but I didn't know."

record. As has been stated, it is apparent that Neely knew his eligibility was lost the instant he completed the Houston transaction and took the bonus money. Furthermore, the only claimed violation of the secrecy agreement was that Houston filed the contract with the League Commissioner. Nothing issued from the ⌐ommissioner's office occasioned the declaration of ineligibility. The scheme to mislead Neely's school, his coaches, his team, and the Gator Bowl opponents, no doubt would have succeeded but for Neely's own double dealing with Dallas, resulting in his attempt to avoid the Houston contracts. While we do not for a moment condone the ruthless methods employed by professional football teams in their contest for the services of college football players, including the lavish expenditure of money,[7] it must be conceded that there is no legal impediment to contracting for the services of athletes at any time, and the above-mentioned conduct, while regrettable, does not furnish athletes with a legal excuse to avoid their contracts for reasons other than the temptations of a more attractive offer. Although there are many dismal indications to the contrary, athletes, amateur or professional, and those connected with athletics, are bound by their contracts to the same extent as anyone else, and should not be allowed to repudiate them at their pleasure.

Fraud has been defined in Texas as "the successful employment of cunning, deception or artifice to circumvent, cheat or defraud another to his injury." International Life Ins. Co. v. Herbert, Tex.Civ.App., 334 S.W.2d 525, 530.

This court has said that fraud "is never imputed or presumed and the court should not sustain findings of fraud upon circumstances which at the most create only suspicion." Davis v. C. I. R., 10 Cir., 184 F.2d 86, 87, 22 A.L.R.2d 967. The draft system in professional football limited Neely's negotiations initially to Baltimore and Houston. His collegiate football record was such that he and his father-in-law could anticipate that his services would be in demand and would command a premium contract. The opportunity presented to Neely would come but once in his lifetime, and it is understandable that the situation would be exploited to the maximum. It was with this background that Neely negotiated with Houston and Baltimore. Neely, a bright young man,[8] ably advised by his father-in-law, knew exactly what he wanted. With commendable foresight, he sought not only a favorable contract, but also a business arrangement extending beyond his football days. Houston, through its president, undertook to meet this requirement. Neely, after consulting his wife and father-in-law, and after further discussion with Baltimore, accepted Houston's final proposal, which he characterized as a "fine offer." Unexpectedly Dallas arrived on the scene, and Neely found another bidder for his services. He welcomed this new opportunity and apparently plans were set in motion designed to convince him that he could ignore the existing agreements with Houston. The first indication that Houston had of Neely's dissatisfaction with his arrangement was when the contracts were received in the mail on December 31,

---

7. These methods and their adverse effect upon amateur football players were described by Judge Skelly Wright in Detroit Football Company v. Robinson, D.C., 186 F.Supp. 933, 934, where he said:
 "This case is but another round in the sordid fight for football players, a fight which begins before these athletes enter college and follows them through their professional careers. It is a fight characterized by deception, double dealing, campus jumping, secret alumni subsidization, semi-professionalism and professionalism. It is a fight which has produced as part of its harvest this current rash of contract jumping suits. It is a fight which so conditions the minds and hearts of these athletes that one day they can agree to play football for a stated amount for one group, only to repudiate that agreement the following day or whenever a better offer comes along."

8. Neely graduated from the College of Business Administration at the University of Oklahoma with a double major in accounting and finance.

1964. Up to that time there had been no publicity, and Neely was in Jacksonville prepared to play in the January 2nd game. Representatives of Houston were there to arrange for the photographing of a simulated contract-signing ceremony immediately after the game. It was Neely, not Houston, who disclosed to his coach the facts which brought about a declaration of his ineligibility. Even then Neely had lost his eligibility through his transactions with Dallas. There is insufficient evidence to sustain a finding of material misrepresentation on the part of Houston amounting to fraud which would affect the validity of the contracts. It is true that Neely testified that it was his understanding that the contracts were not to become effective until after the game on January 2nd. The contracts, however, provided otherwise, and we are not at liberty to rewrite then. Furthermore, the letter of employment, the filling station arrangement, and the $25,000 bonus check which was delivered upon the execution of the contracts, were all dated December 1, 1964.

 The trial court, in denying the relief sought, apparently applied the equitable maxim that "he who comes into equity must come with clean hands." This doctrine, fundamental in equity jurisprudence, means that equity will not in any manner aid a party whose conduct in relation to the litigation matter has been unlawful, unconscionable, or inequitable. See, Garland v. Brown, D.C.Tex., 52 F.Supp. 401. But the doctrine does not exclude all wrongdoers from a court of equity nor should it be applied in every case where the conduct of a party may be considered unconscionable or inequitable. Office Employees Internat'l Union, etc. v. Houston Lighting & P. Co., Tex.Civ.App., 314 S.W.2d 315; Kirkland v. Handrick, Tex.Civ.App., 173 S.W.2d 735. The maxim admits of the free exercise of judicial discretion in the furtherance of justice. See, Johnson v. Yellow Cab Transit Co., 321 U.S. 383, 64 S.Ct. 622, 88 L.Ed 814. While it is not contended here that Houston did not have a legal right to sign Neely to a professional player's contract, it is urged that when Houston participated in a scheme to conceal that fact for the purpose of permitting an ineligible player to participate in a post-season game, it was such deceit upon others that a court of equity should not intervene to assist in the enforcement of the contract. With this argument we cannot agree. It is neither unlawful nor inequitable for college football players to surrender their amateur status and turn professional at any time. Neely was free to bind himself to such a contract on December 1, 1964 as he would have been after January 2, 1965. Nor was Houston under any legal duty to publicize the contract or to keep it secret. Its agreement to keep secret that which it had a legal right to keep secret cannot be considered inequitable or unconscionable as those terms are ordinarily used in contract negotiations. Neely relies on the case of New York Football Giants v. Los Angeles Chargers F. Club, Inc., 5 Cir., 291 F.2d 471, where, in a somewhat similar situation, the court applied the clean hands doctrine. It is quite apparent that the player contract in that case was acquired under circumstances much different from those in this case, but if the rule announced in that case was intended to apply to every instance in which a contract is entered into with a college football player before a post-season game with an understanding that it be kept secret to permit that player to compete in the game, then we must respectfully disagree with the conclusion.

 The trial court held that the service station agreement violated the Texas Statute of Frauds, Art. 3995, Revised Civil Statutes of Texas, as amended; Vernon's Anno. Texas Statutes Art. 3995, in that it is vague, indefinite, uncertain and unenforceable. The letter agreement specifically provides that the service station will be for the sale and distribution of Phillips '66 products and that Ada Oil Company will arrange for the construction of a "conventional Phillips '66 Service Station of either Series ER 2000, ARS 201 or DRS 201", and be financed according to the plan selected.

It is clear from the unqualified language of the instrument that the station site, the type of station, and the financing thereof is to be determined by Ada Oil Company within the limits specified, without the necessity of further agreement. Such writing satisfies the Texas Statute of Frauds. Tiller v. Fields, Tex. Civ.App., 301 S.W.2d 185.

Reversed and remanded with instructions to grant the injunction.